UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| BRUCE DANIELSON,<br><br>    Plaintiff,<br><br>vs.<br><br>MIKE HUETHER, DAVID PFEIFLE, MARTY<br>JACKLEY, HEATHER HITTERDAL, CITY<br>OF SIOUX FALLS, STATE OF SOUTH<br>DAKOTA, JOHN DOE,<br><br>    Defendants. | 4:18-CV-04039-RAL<br><br><br>OPINION AND ORDER<br>GRANTING IN PART DEFENDANTS'<br>MOTION TO DISMISS |

   Plaintiff Bruce Danielson, proceeding pro se, sued the State of South Dakota, South

Dakota's Attorney General Marty Jackley, the City of Sioux Falls, the City's former mayor Mike

Huether, and City employees David Pfeifle and Heather Hitterdal (collectively "the Defendants").

Doc. 1. Danielson alleges that the Defendants violated 42 U.S.C. § 1983, the Racketeer Influenced

and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, and state law. Doc 1. The

Defendants have moved to dismiss all of Danielson's claims under Rule 12(b)(6) of the Federal

Rules of Civil Procedure. Doc. 11. For the reasons explained below, this Court grants in part and

denies in part Defendants' motion to dismiss.

## I.   Facts

   A district court considering a motion to dismiss under Rule 12(b)(6) usually draws the facts

from the complaint, documents that are embraced by the complaint, matters of public record, and

items subject to judicial notice. See Dittmer Props., L.P. v. FDIC, 708 F.3d 1011, 1021 (8th Cir.

2013). Here, Danielson has requested leave to amend his complaint before dismissal with prejudice and has submitted an "Appendix of Proposed Supplemental Pleading" in support of this request. Doc. 18 at 32–53. He states that the "exemplar proposed amendments" in the appendix "are intended to illustrate the detail which is known and can be pleaded as required." Doc. 18 at 5; see also Doc. 18 at 26 (referring to the appendix as his "proposed amendments"). The District of South Dakota's Local Rules state that "any party moving to amend a pleading must attach a copy of the proposed amended pleading to its motion to amend with the proposed changes highlighted or underlined so that they may be easily identified." D.S.D. Civ. LR 15.1. Although Danielson has not complied with the local rules for filing an amended complaint, this Court will consider the allegations in the appendix along with those in the complaint when deciding whether Danielson has stated a claim under Rule 12(b)(6). See Pratt v. Corrs. Corp. of Am., 124 F. App'x 465, 466 (8th Cir. 2005) (per curiam); Anthony v. Runyon, 76 F.3d 210, 214 (8th Cir. 1996).[1]

Danielson, a resident of Sioux Falls, is a long-time advocate for open government and public access to government information. Doc. 1 at ¶ 30. He participates in Sioux Falls City Council meetings and frequently criticized Huether's conduct as mayor. Danielson contributes articles and videos of public events to www.southdacola.com, a blog operated by Scott Ehrisman.

---

[1] The Eighth Circuit's decisions in Anthony and Pratt allow courts to consider allegations in a response to a motion to dismiss even if those allegations are not in the complaint. The Seventh Circuit takes this approach, Smith v. Dart, 803 F.3d 304, 311 (7th Cir. 2015) (holding that "facts alleged by a plaintiff in a brief in opposition to a motion to dismiss may be considered when evaluating the sufficiency of a complaint so long as they are consistent of the allegations in the complaint") (cleaned up), but other circuits, as well as district judges within the Eighth Circuit, have not, Roebuck v. Dothan Sec., Inc., 515 F. App'x 275, 280 (5th Cir. 2013) (per curiam); Broam v. Bogan, 320 F.3d 1023, 1026 n.2 (9th Cir. 2003); Miller v. Huron Reg'l Med. Ctr., Inc., No. 12-4138-KES, 2014 WL 1608695, at *2 n.1 (D.S.D. Apr. 22, 2014). Rather than confining its consideration to the complaint and have Danielson then seek to amend to restate claims differently, this Court believes it best to consider all of Danielson's filings when ruling on this motion to dismiss. Proceeding in this manner does not harm the Defendants because the complaint alone adequately pleads those claims that survive the Defendants' motion to dismiss.

Doc. 1 at ¶¶ 31–32. Ehrisman uses the blog to write about local politics and promote government transparency. Doc. 1 at ¶¶ 32, 50.

Although Danielson's allegations against the Defendants are wide-ranging, the dominant theme is that Huether used his power as mayor to retaliate against Danielson for criticizing him and investigating his conduct. According to Danielson, Huether had him arrested in July 2014 to prevent him from testifying at a Sioux Falls City Council meeting, Doc. 1 at ¶ 95; Doc. 18 at 32–36; instigated his prosecution in September 2014, Doc. 1 at ¶ 96; Doc. 18 at 37; attempted to intimidate him after he spoke at City Council meetings, Doc. 1 at ¶¶ 80–84, and refused to treat him like other members of the media when he was collecting information for the <u>southdacola</u> blog, Doc. 1 at ¶ 98. Danielson also claims that Huether struck him in the back of the head during an April 2015 City meeting, causing damage to his teeth, head, and neck. Doc. 1 at ¶¶ 33–34. Danielson alleges multiple conspiracies by the Defendants, including a conspiracy between Huether and Jackley to cover-up Huether's assault of Danielson and a conspiracy to use Huether's power as mayor to create favorable investments opportunities for Huether's family.

Danielson alleges that the Defendants violated § 1983, RICO, and state law. He is suing Huether, Jackley, Pfeifle, and Hitterdal in both their official and individual capacities, and requests punitive damages, compensatory damages, and attorney's fees from all the Defendants.

## II.     Standard of Review

On a motion to dismiss under Rule 12(b)(6), courts must accept a plaintiff's factual allegations as true and construe all inferences in the plaintiff's favor, but need not accept a plaintiff's legal conclusions. <u>Retro Television Network, Inc. v. Luken Commc'ns, LLC</u>, 696 F.3d 766, 768–69 (8th Cir. 2012). To survive a motion to dismiss for failure to state a claim, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."

Fed. R. Civ. P. 8(a)(2). Although detailed factual allegations are unnecessary, the plaintiff must plead enough facts to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," Iqbal, 556 U.S. at 678, "even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely,'" Twombly, 550 U.S. at 556 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). Still, "conclusory statements" and "naked assertion[s] devoid of further factual enhancement" do not satisfy the plausibility standard. Iqbal, 556 U.S. at 678 (alteration in original) (citation and internal marks omitted).

The Eighth Circuit requires district courts to construe pro se complaints liberally. Stone v. Harry, 364 F.3d 912, 914 (8th Cir. 2004). This means "that if the essence of an allegation is discernible, even though it is not pleaded with legal nicety, then the district court should construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework." Id. at 915. Importantly, however, this rule of liberal construction does not excuse a pro se plaintiff from alleging enough facts to support his claims. Id. at 914. That is, even though a plaintiff is proceeding pro se, the district court will not "assume facts that are not alleged, just because an additional factual allegation would have formed a stronger complaint." Id. at 915.

III.    **Analysis**

   A.    **Section 1983 Claims**

Section 1983 provides a cause of action against any "person" who, acting "under color of" state law, deprives the plaintiff of "rights, privileges, or immunities secured by the Constitution" or granted by federal statute. 42 U.S.C. § 1983. Defendants construe Danielson's complaint as

4

alleging four claims under § 1983: a First Amendment retaliation claim, a First Amendment claim based on the failure to treat Danielson like other members of the press, a § 1983 civil conspiracy claim, and a claim against the City of Sioux Falls under Monell v. Department of Social Services, 436 U.S. 658 (1978). Danielson appears to agree that these are the § 1983 claims he is bringing, although he disagrees with the Defendants about the scope of some of his claims and what he must show to succeed on them. Defendants argue that Danielson's § 1983 claims should be dismissed because the Eleventh Amendment bars any claims against the State of South Dakota and Jackley in his official capacity; prosecutorial and qualified immunity bar any claims against Jackley in his individual capacity; and all of Danielson's allegations fail to state a claim under Rule 12(b)(6). This Court addresses these arguments in turn.

### 1. Claims against the State of South Dakota and Jackley in his Official Capacity

Danielson's claims against the State of South Dakota and claims for damages against Jackley in his official capacity must be dismissed. First, § 1983 only provides a cause of action against a "person" who, acting under the color of state law, deprives another of his or her federal constitutional or statutory rights. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989). The Supreme Court in Will held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983" when sued for money damages. Id. Section 1983 therefore does not allow Danielson to sue the State of South Dakota or Jackley in his official capacity for damages. Id.; see also Arizonans for Official English v. Arizona, 520 U.S. 43, 69 n.24 (1997) ("State officers in their official capacities, like States themselves, are not amenable to suit for damages under § 1983."). Second, absent consent by the state or congressional abrogation of immunity, the Eleventh Amendment generally bars federal-court lawsuits seeking monetary damages from states or individual state officers in their official capacities. Will, 491 U.S. at 66;

Edelman v. Jordan, 415 U.S. 651, 662–63 (1974); Trevelen v. Univ. of Minn., 73 F.3d 816, 818 (8th Cir. 1996). Section 1983 did not abrogate South Dakota's Eleventh Amendment immunity, Quern v. Jordan, 440 U.S. 332, 345 (1979), and South Dakota and Jackley have raised Eleventh Amendment immunity as a defense in this case. Danielson argues, however, that South Dakota has consented to suit under SDCL § 21-32-16, which provides:

> To the extent such liability insurance is purchased pursuant to § 21-32-15 and to the extent coverage is afforded thereunder, the state shall be deemed to have waived the common law doctrine of sovereign immunity and consented to suit in the same manner that any other party may be sued.

SDCL § 21-32-16. But as the State of South Dakota made clear in an affidavit and an attached agreement, neither it nor any of its agencies have purchased liability insurance or participate in a risk-sharing pool that provides coverage to the State itself or to any of its agencies. Doc. 20 at ¶ 5; see also Ballegooyen v. Brownson, 4:14-CV-04186-KES, 2016 WL 5794719, at *3 (D.S.D. Sept. 30, 2016) (holding that SDCL § 21-32-16 did not waive the Eleventh Amendment immunity of two state agencies). Section 21-32-16 therefore does not waive South Dakota's immunity for suits like Danielson's seeking money damages.

### 2. Individual Capacity Claims Against Jackley

Danielson's claims against Jackley concern an alleged conspiracy to cover-up Huether's assault of Danielson at the April 2015 City meeting. Danielson submitted a "formal criminal complaint" to the South Dakota Division of Criminal Investigation (DCI) alleging that Huether had assaulted him during the meeting. Doc. 1 at ¶¶ 36–37. According to Danielson, Jackley, at the request of Huether and others, stopped the DCI's investigation of Danielson's complaint before the DCI could prove that the assault occurred. Doc. 1 at ¶¶ 39–44. Danielson alleges "that there

was a conspiracy between Huether, Pfeifle and Jackley where Jackley was persuaded to help Huether cover-up his assault on Danielson." Doc. 18 at 48.

Prosecutors like Jackley who are sued under § 1983 may be entitled to either absolute or qualified immunity. Kalina v. Fletcher, 522 U.S. 118, 123–26 (1997). The type of immunity available depends on the function the prosecutor was performing when the alleged misconduct occurred. Id. at 127. Prosecutors have absolute immunity for actions "intimately associated with the judicial phase of the criminal process," Imbler v. Pachtman, 424 U.S. 409, 430 (1976), including the decision to prosecute a case, id. at 431 n.33, the decision *not* to prosecute a case, Botello v. Gammick, 413 F.3d 971, 976 (9th Cir. 2005); Doe v. Phillips, 81 F.3d 1204, 1209 (2d Cir. 1996), and the presentation of evidence at trial, Imbler, 424 U.S. at 431 n.33. By contrast, prosecutors only have qualified immunity for the performance of investigative or administrative functions unrelated to trial preparation. Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993).

Absolute immunity applies to Jackley's decision not to prosecute Huether. Danielson's argument to the contrary misreads Buckley. The Supreme Court in Buckley held that qualified immunity did not protect a prosecutor who fabricated evidence during the preliminary investigation of an unsolved crime. Id. at 275. In reaching this conclusion, the Supreme Court stated that "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." Id. at 274. Danielson argues that this sentence from Buckley means that Jackley is not entitled to absolute immunity unless he had probable cause to arrest Huether for assault at the time he allegedly halted the DCI's investigation of Danielson's complaint. As the Supreme Court clarified in a footnote in Buckley, however, the line between absolute and qualified immunity turns on the function the prosecutor is performing rather than the point at which the prosecutor decides there is probable cause. Id. at 274 n.5. The Court explained

7

that a prosecutor's decision to indict is protected by absolute immunity, "whether he has probable cause or not." Id. Because Jackley's decision not to prosecute Huether was intimately associated with the judicial process, it is protected by absolute immunity, regardless of any question about probable cause.

Danielson and Defendants agree that Jackley is only entitled to qualified immunity when acting in an administrative or investigatory capacity. Danielson claims that Jackley acted as an administrator or investigator when he allegedly told the DCI to stop investigating Danielson's complaint. "Qualified immunity shields a government official from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." Partlow v. Stadler, 774 F.3d 497, 501 (8th Cir. 2014). Courts use a two-step inquiry to determine whether qualified immunity applies: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." Id. "Government officials are entitled to qualified immunity unless both of these questions are answered affirmatively." Greenman v. Jessen, 787 F.3d 882, 887 (8th Cir. 2015) (cleaned up).

Danielson argues that qualified immunity does not apply because Jackley should have known that covering up the April 2015 assault violated a clearly established right. As explained below, however, Danielson has not adequately alleged that Jackley conspired with others to conceal the alleged assault. Thus, this Court need not decide whether Jackley is entitled to qualified immunity. Danielson's claims against Jackley are all dismissed.[2]

---

[2]If Danielson claims he has some sort of free-standing right to have Huether investigated, he is incorrect. The law is clear that there is no independent constitutional right to the investigation of another. Lee v. City of Philadelphia, 627 F. App'x 175, 177 (3d Cir. 2015) (per curiam); Mitchell v. McNeil, 487 F.3d 374, 378 (6th Cir. 2007); Andrews v. Fowler, 98 F.3d 1069, 1078–79 (8th

### 3. First Amendment Retaliation

The First Amendment generally bars government officials from retaliating against an individual for exercising his right to free speech. Hartman v. Moore, 547 U.S. 250, 256 (2006). To state a First Amendment retaliation claim, Danielson must show: (1) that he engaged in activity protected by the First Amendment; (2) that the Defendants took adverse action against him that would chill a person of ordinary firmness from continuing the activity; and (3) that the adverse action was motivated at least in part by Danielson's protected activity. Bennie v. Munn, 822 F.3d 392, 397 (8th Cir. 2016); Greenman, 787 F.3d at 891; see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

Danielson alleges four types of retaliation, the first being that Huether assaulted him during the April 2015 City meeting. Doc. 1 at ¶ 33. Danielson asserts that this assault was in retaliation for exercising his First Amendment rights and that Huether intended to deter him from making further reports about Huether's conduct. Doc. 1 at ¶ 35. Defendants contend that Danielson has failed to state a claim because he has not identified what constitutional activity prompted the assault. True, the portion of Danielson's complaint discussing the alleged assault does not specify what conduct motivated Huether to retaliate against Danielson, Doc. ¶¶ 33–35, and some of the protected activity Danielson claims he engaged in occurred after the alleged April 2015 assault, Doc. 1 at ¶¶ 80–84. At this stage, however, Danielson's complaint "should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009). And as Danielson tells it, he and Huether had a significant history by April 2015. Danielson alleges that he filed an ethics complaint

---

Cir. 1996); Flinchum v. City of Beattyville, 224 F. Supp. 3d 536, 542 n.2 (E.D. Ky. 2016); Doe v. Mayor & City Council of Pocomoke City, 745 F. Supp. 1137, 1139 (D. Md. 1990).

against Huether in late March 2014 claiming that Huether was using City funds to advocate for issues he supported and campaign for reelection. Doc. 1 at ¶ 90. This complaint resulted in a hearing before the ethics board, Doc. 1 at ¶ 91, and Danielson alleges that it made Huether angry at him, Doc. 18 at 38. Danielson also alleges that Huether and others orchestrated his arrest in July 2014 to prevent him from testifying before the City Council about the events center. Doc. 1 at ¶¶ 95–96; Doc. 18 at 33, 37. Danielson further alleges, albeit without providing specific dates, that he worked during Huether's tenure as mayor to "publicize" the benefits Huether's family was receiving from Huether's official actions. Doc. 1 at ¶ 117. The First Amendment protects Danielson's ethics complaint and criticisms of Huether. See Williams v. City of Carl Junction, 480 F.3d 871, 874 (8th Cir. 2007) ("The criticism of public officials lies at the heart of speech protected by the First Amendment . . . ."). A reasonable reading of Danielson's entire complaint is that Huether assaulted him for filing the ethics complaint and otherwise criticizing Huether.

As to the second element of a First Amendment retaliation claim, this Court must determine whether it is plausible that Huether striking Danielson hard enough supposedly to damage his teeth, head, and neck would deter a person of ordinary firmness from continuing to criticize Huether. This second element is objective: "the question is not whether the plaintiff himself was deterred, though how plaintiff acted might be evidence of what a reasonable person would have done." Scheffler v. Molin, 743 F.3d 619, 621 (8th Cir. 2014) (cleaned up). When applying the ordinary firmness test, courts should be "mindful" that the "effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." Garcia v. City of Trenton, 348 F.3d 726, 729 (8th Cir. 2003) (citation omitted). This Court has little trouble concluding that the assault alleged by Danielson would deter an ordinary person from further exercising his First Amendment Rights.

See Coady v. Steil, 187 F.3d 727, 734 (7th Cir. 1999) ("We think it clear that being punched in the face would deter anyone from exercising his or her First Amendment rights.").

This leaves the last element, which requires Danielson to show a causal connection between the alleged assault and his protected activity. Whether a causal connection exists is "generally a jury question." Revels v. Vincenz, 382 F.3d 870, 876 (8th Cir. 2004). A plaintiff may demonstrate a causal connection through circumstantial evidence, such as unusually suggestive timing for the adverse action. Tyler v. Univ. of Ark. Bd. of Trs., 628 F.3d 980, 986 (8th Cir. 2011). Here, over a year passed between Danielson filing the ethics complaint and Huether allegedly assaulting Danielson. This gap between protected activity and retaliation could make showing causation difficult if Danielson were suing Huether for firing him or taking some other action that could have a lawful explanation. See Heaton v. The Weitz Co., Inc., 534 F.3d 882, 888 (8th Cir. 2008) ("[T]he passage of time between events does not by itself foreclose a claim of retaliation; rather, it weakens the inference of retaliation that arises when a retaliatory act occurs shortly after a complaint.") (cleaned up). Under the facts Danielson has alleged, however, Huether wanting to retaliate against Danielson for filing the ethics complaint and otherwise criticizing him is the only plausible explanation for striking Danielson in the back of the head. Danielson has adequately pleaded a First Amendment retaliation claim based on the alleged assault.[3]

---

[3]If Danielson asserts a retaliation claim based on the assault against anyone other than Huether, he has failed to state a claim against these Defendants. The closest Danielson comes to alleging that the other defendants were involved in the assault is his allegation that Hitterdal witnessed the assault but did not report it or "preserve evidence" of it. Doc. 1 at ¶ 58. This single allegation is insufficient as a matter of law to make Hitterdal individually liable for the alleged assault. See Iqbal, 556 U.S. at 676 (explaining that a plaintiff in a § 1983 suit "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution").

Danielson's next claims are that his arrest and prosecution in 2014 were retaliation for exercising his First Amendment rights. Doc. 1 at ¶¶ 95–97. He alleges that Huether and certain "subordinate prosecutors" orchestrated his July 2014 arrest to prevent him from providing his "expert" opinion at a City Council meeting. Doc. 18 at 32–33, 37; Doc. 1 at ¶ 95. Danielson planned to testify about the inadequacies of the metal siding Huether advocated using on the events center. Doc. 18 at 32–33; Doc. 1 at ¶ 95. According to Danielson, he was arrested mere hours before the City Council meeting at which he was to testify and was released shortly after the meeting ended. Doc. 18 at 34. Paul Bengford, a prosecutor who Danielson claims was a "subordinate" of Huether, issued the warrant for Danielson's arrest. Doc. 18 at 33. Danielson provides almost no information about the basis for his arrest, other than alleging that he was "arrested for not paying civil fees and based on convictions developed using the process which was invalidated in <u>Daily v. City of Sioux Falls;</u> 2001 SD 48 ten years prior to his arrest." Doc. 18 at 36. Danielson alleges that the City eventually dropped the charges for which he was arrested and relied on different charges to prosecute him in September 2014. Doc. 18 at 35; <u>see also</u> Doc. 18 at 18. According to Danielson, the September prosecution was for having nuisances in his yard and a judge acquitted him of all charges. Doc. 18 at 37; Doc. 1 at ¶ 96.

Defendants argue that Danielson has not stated a claim for retaliatory prosecution because he failed to allege the absence of probable cause for the underlying charges or that Huether caused the prosecution. The Defendants rely on the Supreme Court's decision in <u>Hartman</u> and the Eighth Circuit's decision in <u>Williams</u> for support. The Supreme Court in <u>Hartman</u> held that a plaintiff asserting a First Amendment claim of retaliatory prosecution must plead and prove the absence of probable cause for the underlying charge. 547 U.S. at 263–66. The Supreme Court offered two main reasons for its holding: (1) evidence showing probable cause or its absence will be highly

probative of retaliatory animus; and (2) showing a causal link between retaliatory animus and the plaintiff's injury in a retaliatory prosecution case is "usually more complex than it is in other retaliation cases," where the government official bearing the animus also took the adverse action. Id. at 261. As to the second reason, the Supreme Court explained that prosecutors have absolute immunity from suits for filing charges, so the defendant in a retaliatory prosecution case will typically be a nonprosecuting government official. Id. at 261–62. Thus, the plaintiff in a retaliatory-prosecution case must show not only that the nonprosecuting official "acted in retaliation," but also that the official "induced the prosecutor to bring charges that would not have been initiated without his urging." Id. at 262. The Supreme Court concluded that requiring a plaintiff to show the absence of probable cause would "bridge the gap between the nonprosecuting government agent's motive and the prosecutor's action." Id. at 263; see also id. at 259 ("It is . . . the need to prove a chain of causation from animus to injury, with details specific to retaliatory-prosecution cases, that provides the strongest justification for the no-probable-cause requirement . . . .").

Similar to this case, the plaintiff in Williams claimed that the mayor had induced the police chief and city administrator to cite him for city-ordinance violations in retaliation for criticizing the mayor. 480 F.3d at 876. Relying on Hartman, the Eighth Circuit held that the plaintiff had to show an absence of probable cause for the citations to establish a causal connection between the mayor's retaliatory animus and the officials' "prosecution" of the plaintiff. Williams, 480 F.3d at 876–77.

Danielson has not pleaded enough facts to make it plausible that Huether or anyone else induced Bengford to charge Danielson with having nuisances in his yard. To be sure, Danielson makes several allegations about Huether's involvement with his arrest in July 2014 for failing to

pay civil fines; he alleges that Huether knew that Danielson planned to offer his opinion at the City Council meeting, that he was arrested mere hours before the meeting and was released shortly after it ended, and that the arrest was the result of a plan by Huether and his subordinate prosecutors to keep him from testifying. Doc. 18 at 32–34. Danielson reiterates in his brief that the arrest "was to prevent him from providing testimony in an official public forum where it would have to be considered and the parties present could not deny what they were told." Doc. 18 at 17. As Danielson tells it, however, the City eventually dropped the civil-fine charges for which he was arrested and took him to trial in September 2014 on the nuisance charges. Doc. 18 at 35–37; see also, Doc. 18 at 18. Unlike the arrest, Danielson has made very few allegations suggesting that Huether, after having accomplished his alleged goal of preventing Danielson from testifying at the July 2014 City Council meeting, induced Bengford to prosecute Danielson in September on different charges than those for which he was initially arrested. The most that Danielson alleges is that Huether controlled Bengford's salary, that Huether "engaged the punitive machinery of the City to suppress Danielson's free speech rights and that led to Danielson being charged and arrested," and that the trial judge found that the City had "misapprehend[ed]" the law on public nuisances and acquitted Danielson. Doc. 18 at 35–37. Although this Court must draw all inferences in Danielson's favor, the plausibility standard "asks for more than a sheer possibility" that Huether acted unlawfully. Iqbal, 556 U.S. at 678. Neither these allegations nor any other allegations in the complaint or appendix allow this Court to infer more than a mere possibility that Huether induced Bengford to prosecute Danielson for the nuisance charges.

This leaves Danielson's claim for retaliatory arrest. As with his retaliatory prosecution claim, Danielson must plead and prove the absence of probable cause to succeed on his retaliatory

14

arrest claim.[4] Williams, 480 F.3d at 876–77; see also Peterson v. Kopp, 754 F.3d 594, 602 (8th

Cir. 2014) (requiring an absence of probable cause to prove a First Amendment retaliation claim

against the police officer who allegedly both harbored the retaliatory animus and made the arrest

based on the animus).[5] Requiring Danielson to prove the absence of probable cause makes

particular sense under the logic in Hartman because Danielson is alleging that Huether induced

Bengford to issue an arrest warrant for Danielson. Doc. 18 at 33. Bengford had probable cause

for the arrest if at the moment he issued the warrant, "the facts and circumstances within

[Bengford's] knowledge and of which [Bengford] had reasonably trustworthy information were

sufficient to warrant a prudent man in believing" that Danielson had violated the law.[6] Williams,

480 F.3d at 877 (citation and internal cites omitted). Danielson does not allege a lack of probable

cause in his complaint, but he asserts in his appendix that his arrest in July 2014 "was not based

on valid probable cause." Doc. 18 at 32. "[L]egal conclusions" like Danielson's allegation that

---

[4]There is some question in the Eighth Circuit about whether a plaintiff alleging retaliatory
regulatory action by a city must show an absence of probable cause. See Osborne v. Grussing,
477 F.3d 1002, 1006 (8th Cir. 2007) (holding that a plaintiff bringing a retaliation claim based on
a "valid adverse regulatory action" must show that he was "singled out for prosecution while others
similarly situated have not been prosecuted for conduct similar to that for which he was
prosecuted" (citation omitted)); see also Scott v. Tempelmeyer, 867 F.3d 1067, 1071–72 (8th Cir.
2017) (discussing Osborne and Williams). Unlike Osborne, this case involves a criminal charge
for which Danielson was arrested. And even if the causation standard in Osborne applied,
Danielson has failed to plead sufficient facts to satisfy it.

[5]The Supreme Court recently heard argument on whether probable cause defeats a retaliatory arrest
claim brought against the arresting officer. See Howard M. Wasserman, Argument analysis:
"Contempt of cop"—Justices search for compromise standard for First Amendment retaliatory
arrests, SCOTUSblog (Nov. 27, 2018), http://www.scotusblog.com/2018/11/argument-analysis-
contempt-of-cop-justices-search-for-compromise-standard-for-first-amendment-retaliatory-
arrests/. Until the Supreme Court rules otherwise, this Court must follow the law of the Eighth
Circuit on retaliatory arrest claims.

[6]In Keenan v. Tejeda, 290 F.3d 252 (5th Cir. 2002), the Fifth Circuit stated that probable cause in
the context of malicious prosecution claims refers to the "existence of such facts and circumstances
as would excite the belief, in a reasonable mind, acting on the facts within the knowledge of the
prosecutor, that the person charged was guilty of the crime for which he was prosecuted." Id. at
260 (citation omitted).

probable cause was lacking "can provide the framework of a complaint," but "they must be supported by factual allegations," Iqbal, 556 U.S. at 679, sufficient to "plausibly suggest an entitlement to relief," id. at 681. The following sentence is the closest Danielson comes to pleading facts suggesting an absence of probable cause: "Danielson was purportedly arrested for not paying civil fees and based on convictions developed using the process which was invalidated in Daily v. City of Sioux Falls; 2001 SD 48 ten years prior to his arrest." Doc. 18 at 36. This Court assumes that Danielson meant to refer to Daily v. City of Sioux Falls, 802 N.W.2d 905 (S.D. 2011), which was decided in 2011. The plaintiff in Daily sued the City of Sioux Falls after an unsuccessful administrative appeal in which he challenged the citations he received for violating city ordinances. The Supreme Court of South Dakota held that the administrative appeals process the City of Sioux Falls used violated the plaintiff's procedural due process rights because (1) the City had required the plaintiff to prove that it incorrectly issued the citations rather than bearing this burden itself; and (2) the administrative hearing examiner had failed to fairly apply the applicable rules of evidence. Id. at 912–17. Danielson's one-sentence reference to the Daily case and being arrested for failing to pay "civil fees" does not provide enough factual content to plausibly suggest that Bengford lacked probable cause to issue the arrest warrant. Danielson does not allege any facts indicating that he did not commit the violations for which he was fined and eventually arrested for failing to pay.[7] Nor does Danielson allege that he challenged the fines through the City's administrative appeals process, let alone that the City improperly assigned him the burden

---

[7]Danielson has made allegations about the nuisance charges for which he was prosecuted. Danielson alleges that the state court acquitted him of these charges because it found that the City "failed to state a crime even if its allegations could be proven," Doc. 18 at 36, and that the City had "misapprehend[ed]" the law, Doc. 18 at 37. Because Danielson claims that the civil-fine charges for which he was arrested were different from the nuisance charges for which he was tried, these allegations do not suggest a lack of probable cause for his arrest.

16

of proof during this process or applied the rules of evidence unfairly. Danielson's claims against the individual Defendants for retaliatory prosecution and arrest are dismissed.[8]

Danielson's third theory of retaliation is that Huether attempted to intimidate him after City Council meetings occurring in November 2015, January 2016, July 2016, and December 2017. Doc. 1 at ¶¶ 80–84. Danielson describes four instances where he spoke at City Council meetings only to leave the meetings and find Huether standing in the parking lot next to Danielson's car. Doc. 1 at ¶¶ 80–84. Danielson claims that Huether had positioned himself so that Danielson would need to pass by to reach his vehicle. Doc. 1 at ¶¶ 80–83. As Danielson tells it, he "believed [Huether's] presence, actions and demeanor were an attempt to intimidate him to not use his speech rights and an attempt to provoke a situation [Huether] could use to criminally prosecute Danielson." Doc. 1 at ¶¶ 80–83. Danielson alleges that he had City Council security staff escort him to his car after one of the meetings and that on that occasion Huether walked away from Danielson's car and got into his own vehicle. Doc. 1 at ¶ 83. Danielson does not allege what happened on the other occasions, although he asserts in his brief that he "successfully took steps" to disrupt Huether's plan to retaliate, "such as turning around or walking on a different path to prevent a confrontation." Doc. 18 at 21.

Danielson has adequately alleged that he engaged in protected activity at the City Council meetings; he describes voicing his opinion and criticisms on various undertakings by the City of Sioux Falls. Doc. 1 at ¶¶ 80–83; see also Doc. 18 at 43–46. Danielson's allegations also allow a

---

[8]Danielson argues that the Supreme Court's recent decision in Lozman v. City of Riviera Beach, 138 S. Ct. 1945 (2018), allows him to bring a First Amendment retaliation claim without showing the absence of probable cause. But Lozman involved a claim that a city had retaliated against the plaintiff under an official municipal policy of intimidation rather than a claim against individual city employees. This Court therefore addresses Danielson's argument under Lozman in the Monell section of this opinion and order.

reasonable inference that Huether's actions were motivated at least in part by Danielson's protected activity. After all, Danielson claims that he criticized Huether and his administration at the meetings and the alleged retaliatory conduct occurred immediately after the meetings ended. Doc. 1 at ¶¶ 80–83; Doc. 18 at 43–46.

The Defendants argue, however, that Huether standing by Danielson's car after the meetings would not deter a person of ordinary firmness from continuing to exercise his First Amendment rights. They also note that Huether's conduct did not deter Danielson, who continued to appear at City Council meetings to voice his opinions. But again, the ordinary firmness test is an objective one. And under Eighth Circuit law, the factfinder should decide the ordinary firmness question unless the alleged retaliation "is so inconsequential that even allowing a claim would trivialize the First Amendment." Bennie, 822 F.3d at 398 n.2 (cleaned up). This Court cannot say, at least at this stage of the case, that Huether's conduct was so inconsequential that Danielson's claim must be dismissed as a matter of law. Danielson alleges that Huether waited by his car four different times after Danielson criticized Huether's administration during City Council meetings. Although this conduct alone might not seem intimidating, Huether had already allegedly assaulted Danielson back in April 2015 supposedly for criticizing him. Under these circumstances, a reasonable inference from the complaint is that Huether's conduct could deter a person of ordinary firmness from exercising his First Amendment rights.[9]

Danielson's last retaliation claim is that "[a]t a time unknown, Huether, Hitterdal and Pfeifle established a policy of refusing to allow Ehrisman, or Danielson who frequently acted as an assistant to Ehrisman to be treated as media and receive the same treatment as other media when

---

[9]Danielson has not alleged that the other Defendants were involved in Huether's alleged attempt to intimidate him after the City Council meetings. Thus, if Danielson is suing the other Defendants for Huether's conduct, he has failed to state a claim upon which relief can be granted.

they were collecting information for the" southdacola blog. Doc. 1 at ¶ 98. According to Danielson, City employees informed him that his activities do not meet the criteria for being a media organization but have refused to provide him with the "legal basis" for this decision. Doc. 1 at ¶ 102. Danielson claims that the City told him that he could no longer receive notifications of press releases and conferences normally sent to the media, Doc. 1 at ¶¶ 104–06; that Huether has "refused to answer questions from persons asking on behalf of www.southdacola.com or the website www.sioufall.org," Doc. 1 at ¶ 103; and that the City has denied him "access to special locations for photographing and recording," Doc. 1 at ¶ 99.[10] Danielson argues the Defendants took these actions to retaliate against him for exercising his First Amendment rights.

At least two federal circuit courts have held that retaliatory conduct similar to the type Danielson alleges would not deter a person of ordinary firmness from engaging in protected activity. In Smith v. Plati, 258 F.3d 1167 (10th Cir. 2001), for instance, the plaintiff, who operated a website covering athletics at the University of Colorado, claimed that the assistant athletic director denied him access to resources routinely given to other media, denied him treatment as "media" or "press," prevented him from speaking with coaches, and excluded him from football practices. Id. at 1172. The Tenth Circuit held that the assistant athletic director's conduct would not have deterred a person of ordinary firmness because while the conduct made it more difficult to gather some information, the plaintiff had other avenues to obtain information and was not prevented from operating his website. Id. at 1177. Similarly, the Eighth Circuit in Eggenberger v. West Albany Township, 820 F.3d 938 (8th Cir. 2016), held that a township's refusal to allow a

---

[10]Danielson also alleges that the City deprived him of the right to "freedom from being verbally insulted and assaulted when asking questions during public media events." Doc. 1 at ¶ 100. This Court has already ruled that Danielson has stated a First Amendment retaliation claim based on Huether's alleged assault of Danielson in April 2015. If Danielson is referring to some other conduct, he has failed to explain what this conduct was.

vocal critic of the township to view and photocopy documents that were generally available to the public would not deter a person of ordinary firmness from speaking. Id. at 943.

Like the plaintiffs in Smith and Eggenberger, the conduct Danielson complains of does not satisfy the ordinary firmness test. The Defendants may have made it more difficult for Danielson to access certain information, but Danielson does not claim that the Defendants prevented him from publicizing what he wished about the City of Sioux Falls. Nor does Danielson claim that he was unable to learn of press releases and press conferences from other sources. And while Danielson wants to be treated like a member of the media, the Fourth Circuit's decision in Baltimore Sun Co. v. Ehrlich, 437 F.3d 410 (4th Cir. 2006), suggests that a reporter of ordinary firmness would not be deterred by Huether's refusal to answer questions or grant access to "special locations for photographing and recording." In Baltimore Sun Co., the governor of Maryland issued a directive prohibiting members of his administration from speaking with two reporters from the Baltimore Sun because of an alleged lack of objectivity. Id. at 413. After the directive, members of Maryland's government refused to answer questions from the reporters and one of the reporters was excluded from a small press briefing. Id. at 413–14. The Fourth Circuit concluded that this conduct was only a *de minimus* inconvenience given the nature of political reporting. Id. at 419. As the Fourth Circuit explained, public officials regularly choose among reporters when granting interviews or disclosing nonpublic information, and reporters are used to ingratiating themselves with these officials. Id. at 417–19. The Fourth Circuit held that it would be "inconsistent with the journalist's accepted role in the 'rough and tumble' political arena to accept that a reporter of ordinary firmness can be chilled by a politician's refusal to comment or answer questions on account of the reporter's previous reporting." Id. at 419. Danielson's allegations that

Defendants restricted his access to certain information he was gathering for the southdacola blog fail to state a First Amendment retaliation claim.

To recap, Danielson's claim that Huether retaliated against him by striking him in the head, as well as his claim that Huether attempted to intimidate him after City Council meetings, survive Defendants' motion to dismiss. Danielson's retaliation claims based on the arrest, the prosecution, the alleged failure to treat him like other members of the media, and all retaliation claims against the other Defendants are dismissed for failure to state a claim.

### 4. Stand-alone First Amendment Claim

Danielson also appears to assert a stand-alone First Amendment claim based on the Defendants' alleged failure to treat him like other members of the media when he was gathering information for the southdacola blog. Neither the press nor private citizens have a First Amendment right to access government information "beyond that open to the public generally." Houchins v. KQED, Inc., 438 U.S. 1, 10 (1978) (plurality opinion); Eggenberger, 820 F.3d at 942. Thus, for instance, a person could not use the First Amendment to require a public official to give him an exclusive interview, Sherrill v. Knight, 569 F.2d 124, 129 (D.C. Cir. 1977); Raycom Nat'l, Inc. v. Campbell, 361 F. Supp. 2d 679, 683–84 (N.D. Ohio 2004); Snyder v. Ringgold, 40 F. Supp. 2d 714, 718 (D. Md. 1999), or to force a city to provide him with packets of information individually prepared for city council members, Shero v. City of Grove, 510 F.3d 1196, 1201–02 (10th Cir. 2007). However, some courts have held that when the government gives the media general access to press conferences, press facilities, or official meetings, the First Amendment prohibits the government from excluding particular reporters or media entities from these forums. Sherrill, 569 F.2d at 129 (holding that because the White House had established press facilities that were "perceived as being open to all bona fide Washington-based journalists," the First

Amendment required that access to the facilities "not be denied arbitrarily or for less than compelling reasons"); Am. Broadcasting Cos. v. Cuomo, 570 F.2d 1080, 1083–84 (2d Cir. 1977) (holding that New York political candidates could not selectively exclude ABC from a "public function"—primary election activities—while admitting other members of the media); United Teachers of Dade v. Stierheim, 213 F. Supp. 2d 1368, 1373–74 (S.D. Fla. 2002) (holding that the exclusion of a reporter from a press room that was open to the media was an improper denial of access to information); see also Anderson v. Cryovac, Inc., 805 F.2d 1, 9 (1st Cir. 1986) ("A court may not selectively exclude some news media from access to information otherwise made available for public dissemination.").

Danielson's allegations that the Defendants failed to treat him like other members of the media are insufficient to allege a violation of the First Amendment. Unlike the plaintiffs in Cuomo, Sherrill, or Stierheim, Danielson does not claim that government officials excluded him from press conferences or press facilities that were generally open to the public or the media. Rather, Danielson alleges that the City told him that he could no longer receive notifications of press releases and conferences normally sent to the media, Doc. 1 at ¶¶ 104–06; that Huether has "refused to answer questions from persons asking on behalf of www.southdacola.com or the website www.sioufall.org," Doc. 1 at ¶ 103; and that the City has denied him "access to special locations for photographing and recording," Doc. 1 at ¶ 99. Of course, denying a member of the press access to certain types of information otherwise made available for public dissemination could present potential First Amendment problems. Anderson, 805 F.2d at 9. However, Danielson has not cited any Eighth Circuit or Supreme Court opinions holding that he or a person in his position has a right to receive notices of press releases and press conferences. As to Huether's alleged refusal to answer Danielson's questions, government officials have no First Amendment

obligations to respond to a particular reporter. Raycom Nat'l, 361 F. Supp. 2d at 683–84; Snyder, 40 F. Supp. 2d at 718. Finally, Danielson claims that the Defendants denied him access to "special locations" for taking pictures and recording, but he does not plead enough facts to make it plausible that these special locations were otherwise generally available to the media.

### 5. Section 1983 Conspiracy

To state a § 1983 conspiracy claim, Danielson must show that the Defendants (1) conspired with others to deprive him of a constitutional right; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured him. Helmig v. Fowler, 828 F.3d 755, 763 (8th Cir. 2016). Danielson must also show that the Defendants deprived him of a constitutional right or privilege. White v. McKinley, 519 F.3d 806, 814 (8th Cir. 2008). Danielson alleges a conspiracy surrounding Huether's alleged assault of him, a conspiracy between Huether, Huether's family, and unnamed business associates, and a conspiracy between Huether and the chief of police of the City of Sioux Falls.

As to Huether's alleged assault of Danielson, Danielson alleges "that there was a conspiracy between Huether, Pfeifle and Jackley where Jackley was persuaded to help Huether cover-up his assault on Danielson." Doc. 18 at 48. This allegation of a conspiracy is a legal conclusion not entitled to the assumption of truth. Iqbal, 556 U.S. at 680. Danielson's other allegations do not plausibly suggest the existence of a conspiracy surrounding the alleged assault. The most specific and factually substantive allegations in the complaint are that: 1) "At a time unknown, the conspirators communicated with Marty Jackley and requested that Marty Jackley use his authority as South Dakota Attorney General and his supervisory authority over DCI agents to suppress investigation of the alleged incident of assaulting" Danielson on April 14, 2015, Doc. 1 at ¶ 39; 2) "At a time unknown Marty Jackley did act as requested by his co-conspirators to

23

suppress the investigation of Danielson's claim of assault by" Huether, Doc. 1 at ¶ 40; and 3) that Danielson was "told that Marty Jackley issued instructions to stop the investigation before the investigation could solidify evidence establishing that the assault occurred or that Huether committed the assault," Doc. 1 at ¶ 43. Danielson does not expand on these allegations in any way. For instance, Danielson fails to explain how Huether became aware that Danielson had made a complaint to the DCI or how Danielson could possibly know that Huether contacted Jackley to orchestrate dropping the investigation. Nor does Danielson describe when Huether contacted Jackley or provide any specifics about this alleged conversation. These allegations constitute "naked assertions devoid of further factual enhancement," and are therefore insufficient to state a claim. Iqbal, 556 U.S. at 678 (cleaned up) (quoting Twombly, 550 U.S. at 557); see also Grider v. Cook, 590 F. App'x 876, 881 (11th Cir. 2014) (per curiam) (holding that conclusory allegations of a conspiracy to deprive the plaintiff of his rights were insufficient where the plaintiff never provided any specifics about the alleged communications between the defendants); Braden, 588 F.3d at 594 ("[S]ome factual allegations may be so indeterminate that they require further factual enhancement in order to state a claim.") (citation and internal marks omitted). Speculation, rumor mongering, and bald accusations do not satisfy the Iqbal standard.

In any event, Danielson fails to allege a plausible conspiracy even if this Court took as true his allegation that Huether somehow asked Jackley to stop the investigation. Conspiracies are normally kept secret, so plaintiffs can use circumstantial evidence to prove them. Livers v. Schneck, 700 F.3d 340, 361 (8th Cir. 2012). Nevertheless, a plaintiff bringing a § 1983 conspiracy claim must allege "specific facts tending to show" that the defendants reached an agreement to deprive the plaintiff of a constitutional right. Murray v. Lene, 595 F.3d 868, 870 (8th Cir. 2010). The plaintiff does not have to establish that each participant knew the full extent of the scheme,

24

but he "must at least allege that the defendants had directed themselves toward an unconstitutional action by virtue of a mutual understanding and provide some facts suggesting such a meeting of the minds." Smith v. Bacon, 699 F.2d 434, 436 (8th Cir. 1983) (per curiam). Danielson appears to be alleging that Huether, Pfeifle, and Jackley conspired to deprive him of the right to be free from a retaliatory assault for criticizing Huether. Although Danielson alleges that Huether asked Jackley to stop the investigation and that Jackley did so, this does not make it plausible that Huether, Pfeifle, and Jackley reached an agreement to violate Danielson's First Amendment rights. After all, Danielson does not allege that Jackley knew that Huether had actually assaulted him, that Danielson was a long-time critic of Huether, or that Huether harbored retaliatory animus towards Danielson. Absent such allegations, this Court cannot infer that Jackley conspired with Huether and Pfeifle to cover-up Huether's retaliatory assault. See Kelly v. City of Omaha, 813 F.3d 1070, 1078 (8th Cir. 2016) (holding that allegations that a code inspector had directed his coworkers to deny the plaintiff permits unless she met with him were insufficient to allege a conspiracy where the plaintiff did not claim that the coworkers knew that the reasons the code inspector wanted to meet with the plaintiff were inappropriate). Moreover, while Jackley's supposed decision to stop the investigation of the alleged assault could be consistent with a conspiracy, a more plausible explanation of any such action by Jackley is that he simply did not believe that the mayor of Sioux Falls would walk up behind a person during a City meeting and, in full view of the public, strike that person in the back of the head. Danielson's conspiracy claim against Huether, Pfeifle, and Jackley is dismissed for failure to state a claim.

Danielson also alleges a conspiracy between Huether, Huether's family members, and unnamed business partners. As Danielson tells it in his appendix:

> there was a conspiracy between Huether, the financially benefiting family members and various developers and investors whereby a

25

scheme was agreed upon. In that scheme the developers allowed the Mayor to gain financially from the project and in exchange the Mayor ensured the appropriate approvals from the City planning department and other groups. Because some of the conspirators varied in each of these deals it is not known which conspirators agreed on what dates.

Doc. 18 at 48–49. Danielson alleges that Huether and his "business co-conspirators" undertook "criminal acts including the various specified criminal acts identified herein" to maintain the alleged financial scheme. Doc. 1 at ¶ 113. He claims that "the actions of the Mayor and his business co-conspirators were intended to suppress [Danielson's] first amendment rights, deprive him of property rights and due process rights in an effort to further the business interests of the Mayor and his co-conspirators." Doc. 1 at ¶ 107. Danielson's conclusory allegations about a conspiracy between Huether, Huether's family, and unnamed "business co-conspirators" do not plausibly suggest a meeting of the minds directed towards violating Danielson's constitutional rights.[11]

Danielson's last § 1983 conspiracy claim concerns Huether and the chief of police of the City of Sioux Falls. Although Danielson does not mention this claim in his complaint, he alleges in his appendix that Huether and the chief of police "agreed that the Sioux Falls police would not enforce against or prosecute Huether's relatives that were harassing Danielson and vandalizing his property. The conspirators agreed that they would not enforce protection orders benefiting Danielson." Doc. 18 at 49. These bare assertions alleging the existence of a conspiracy are not entitled to be presumed true. Iqbal, 556 U.S. at 681. The only factual allegation Danielson makes

---

[11]Danielson's conspiracy claim involving Huether, Huether's family, and unnamed business partners overlaps somewhat with his RICO claim. Danielson argues in his brief that Defendants are inappropriately attempting to limit his civil conspiracy claim to "only 1983 acts." Doc. 18 at 15. He then asserts that "RICO is at its heart a conspiracy when multiple actors participate as the RICO person." Doc. 18 at 15. This Court addresses Danielson's allegation of a RICO conspiracy in the RICO section of this opinion.

concerning this alleged conspiracy is a claim in the appendix that "City of Sioux Falls Police officers" did not take any action despite overhearing a state court judge say that Danielson's complaints that Huether's relatives had violated a protection order appeared to be "prosecutable." Doc. 18 at 51.[12] Although conspiracies may be proved by circumstantial evidence, this allegation does not plausibly suggest that Huether and the Sioux Falls chief of police reached an agreement to violate Danielson's constitutional rights. All of Danielson's § 1983 conspiracy claims are dismissed for failure to state a claim.

### 6. Monell Claims

The Supreme Court in Monell held that while municipalities can be sued under § 1983 there were limits on such suits. 436 U.S. at 690–95. Most significantly, Monell held that a municipality is not liable under § 1983 simply because one of its employees violated the Constitution. Id. at 691. Rather, a plaintiff suing a municipality under § 1983 must show that the municipality's "policy" or "custom" caused the plaintiff's constitutional deprivation. Id. at 694. This rule "was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." Pembaur v. City of Cincinnati, 475 U.S. 469, 479–80 (1986). Broadly speaking, courts have found a policy or custom when the alleged unconstitutional action

---

[12]This allegation appears in Danielson's appendix under the heading "Equal Protection." Doc. 18 at 50–51. Danielson claims that this allegation shows that he was denied "equal protection of the laws regardless of whether it is due to the fact that the violator is a relative of the Mayor or because he exercises his First Amendment rights in a way the Mayor does not like." Doc. 18 at 51. If Danielson is trying to plead an equal protection claim he has failed to do so; he has not alleged that he is a member of a protected class, he does not have a fundamental right to the prosecution of another, and he does not claim that he was treated differently from others in similar situations. See Gallagher v. Magner, 619 F.3d 823, 839 (8th Cir. 2010). If Danielson is arguing that the police denied him equal protection by withdrawing their services, he has failed to adequately allege that Huether was involved in this withdrawal or that the police were acting on improper personal motives. See Hilton v. City of Wheeling, 209 F.3d 1005, 1007–08 (7th Cir. 2000).

was taken by the municipality's legislative body, Connick v. Thompson, 563 U.S. 51, 61 (2011); when a widespread practice exists that, "although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law," City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988) (plurality opinion) (cleaned up); or when the municipal employee who took the allegedly unconstitutional action has "final policymaking authority" as to "the subject matter in question," Pembaur, 475 U.S. at 483 (plurality opinion). A municipality is not liable under § 1983 unless there is "a direct causal link between" the municipal policy or custom and the plaintiff's constitutional deprivation. City of Canton v. Harris, 489 U.S. 378, 385 (1989); see also Bd. of Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 404 (1997) (explaining that the plaintiff must show that the municipality, "through its _deliberate_ conduct, . . . was the 'moving force' behind the injury alleged"). Moreover, "there must be an unconstitutional act by a municipal employee before a municipality can be held liable," although "there need not be a finding that a municipal employee is liable in his or her individual capacity." Webb v. City of Maplewood, 889 F.3d 483, 487 (8th Cir. 2018) (cleaned up).

Analyzing Danielson's Monell claims is not an easy task; he alleges over ten different policies or customs and is vague about how these policies and customs resulted in a constitutional deprivation. This Court begins its analysis by identifying those allegations that clearly fail under Rule 12(b)(6). Danielson alleges in his appendix that the City has a "policy of ignoring obvious red flags of financial corruption by elected City officials and senior bureaucrats;" a policy "of excessively compensating its senior bureaucrats to ensure that they willingly cooperate and they do not question the legality of requests and schemes orchestrated by the Mayor and his conspirators;" a policy "that the loyalty of the City Attorney's office is responsible to the Mayor first and the public only to the extent it does not conflict with the Mayor's desires;" a policy "of

trying to identify a lawful basis for the Mayor's desired actions and outcomes;" and a policy "of not requiring senior bureaucrats to report or to refuse to implement unlawful requests by the Mayor." Doc. 18 at 49–50. Danielson also alleges that the City allows its employees and elected officials to "destroy and alter public records" and "make untrue statements . . . with no meaningful consequences." Doc. 18 at 50. But Danielson does not elaborate on these conclusory allegations in the appendix, and there is little to support them in the complaint. Nor does Danielson allege sufficient facts to make it plausible that these alleged policies or customs were the moving force behind any constitutional deprivation he suffered. These allegations fail to state a claim upon which relief can be granted.

Danielson's next attempt at pleading a policy or custom focuses on Huether and his alleged role as a policymaker for the City of Sioux Falls. As noted above, actions by an employee with final policymaking authority can create municipal liability under Monell. To establish liability in this manner, however, the plaintiff must show that the conduct challenged in the lawsuit fell within the employee's final policymaking authority. Praprotnik, 485 U.S. at 123. Whether the employee has final policymaking authority is a legal question to be answered on the basis of state law. Atkinson v. City of Mountain View, 709 F.3d 1201, 1214–15 (8th Cir. 2013). Danielson alleges in his complaint that Huether, as mayor, was "the maker of official executive policy and was consequently acting pursuant to either official policy or the custom and practice of . . . the City of Sioux Falls." Doc. 1 at ¶ 23. He makes a similar argument in his brief, claiming that because Huether was the "de facto and de jure policy maker for the City of Sioux Falls, actions by [Huether] are sufficient to establish the executive policy of the City and to therefore induce liability for the City." Doc. 18 at 23. Defendants argue that Danielson has failed to show that Huether is a final policymaker as to his allegedly illegal conduct.

Huether likely had some final policymaking authority under the City of Sioux Falls' Code of Ordinances, which vests the mayor with executive and administrative power. Sioux Falls, S.D., Code of Ordinances § 3.01 (2012). Yet no matter how much authority a municipal employee has over certain areas of a municipality's business, the municipality will not be liable for the employee's actions unless the employee has policymaking authority for the action in question. Pembaur, 475 U.S. at 482–83, 483 n.12 (plurality opinion). The Second Circuit's decision in Roe v. City of Waterbury, 542 F.3d 31 (2d Cir. 2008), illustrates this rule. The issue in Roe was whether a city was liable for acts of sexual abuse its mayor committed against two minor females. Id. at 33. The mayor had sexually abused the females in his office and an unmarked police cruiser, used a city phone to arrange these sexual encounters, and threatened one of the females that her mother would be arrested if she disclosed the abuse. Id. at 33–34. The city's charter gave the mayor extensive budgetary and oversight powers, including the authority to cause the laws to be enforced, to approve the police department's budget, and to sit as chairman of the city's police board. Id. at 38. The plaintiffs argued that the city was liable for the abuse under these circumstances because the mayor's actions constituted the official policy of the city. The Second Circuit disagreed, concluding that while the mayor's "powers were generally broad," the mayor's actions were not in an area in which he was a policymaker. Id. at 38. After all, the city's charter did not give the mayor the power to change or violate the law, id. at 39, and the mayor obviously "had no authority to make policy authorizing, condoning, or promoting the sexual abuse of children," id. at 40. In the Second Circuit's view, holding the city liable for the mayor's acts of sexual abuse "would amount to a finding of *respondeat superior*." Id. at 41.

Here, Danielson appears to be arguing that because Huether is a policymaker for the City of Sioux Falls, Huether's decision to allegedly assault Danielson and attempt to intimidate him

after several City Council meetings constitutes the official policy of the City. As the Second Circuit made clear in Roe, however, the fact that Huether may have some general policymaking authority as mayor does not mean that the City of Sioux Falls is liable under Monell for every action Huether takes. Id. at 38; see also Dahl v. Rice Cty., 621 F.3d 740, 743–44 (8th Cir. 2010) (rejecting argument that because a sheriff was an "autonomous 'policymaker,'" his decision to assault the plaintiff constituted a policy of the county). Nothing in the City's Code of Ordinances or the South Dakota Code gave Huether the authority to alter or violate the law or to make policy authorizing the assault or intimidation of a citizen. Thus, this is not a situation where a city gave its mayor authority to take the action causing the constitutional violation. See Hollins v. Powell, 773 F.2d 191, 195 (8th Cir. 1985) (holding that a city was liable for its mayor's actions where the plaintiffs demonstrated that the mayor had authority under the city's governmental structure to order their arrest). Nor is this a situation where Huether's alleged actions were related to his legitimate job functions or were arguably furthering a legitimate policy goal of the City. See Roe, 542 F.3d at 40 (explaining that "even if advancing an otherwise legitimate policy goal in an illegal or unauthorized manner can, under some circumstances, fall within official policymaking, advancing a purely personal agenda clearly cannot"). Indeed, as Danielson tells it, Huether's main reason for assaulting him and attempting to intimidate him was that Danielson had spoken out about Huether's use of his power as mayor to benefit himself personally. See Doc. 1 at ¶ 90; Doc. 18 at 43–45. Huether did not have final policymaking authority as to his alleged assault and intimidation of Danielson. As in Roe, holding the City of Sioux Falls liable for Huether's alleged misconduct would amount to a finding of *respondeat superior*. See Roe, 542 F.3d at 41.

Danielson also appears to allege that the City of Sioux Falls is liable for Huether's actions because it had a custom of allowing Huether to retaliate against people in violation of the First

Amendment. See Doc. 1 at ¶¶ 33–77; Doc. 18 at 7–8. "A municipal custom is a practice of municipal officials that is not authorized by written law, but which is so permanent and well-settled as to have the force of law." Russell v. Hennepin Cty., 420 F.3d 841, 849 (8th Cir. 2005) (cleaned up). Danielson must establish three elements to prove the existence of a municipal custom:

> (1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the government entity's employees;
> (2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
> (3) The plaintiff's injury by acts pursuant to the governmental entity's custom, i.e., proof that the custom was the moving force behind the constitutional violation.

Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999) (cleaned up).

To show a custom, Danielson relies on Huether's alleged assault of him and attempt to intimidate him after four City Council meetings as well Huether's alleged retaliatory conduct against four other individuals. As Danielson tells it, Huether retaliated against Ehrisman on April 14, 2015, almost immediately after he struck Danielson in the head. Danielson claims that Huether, while walking down the aisle behind the row of chairs where Danielson and Ehrisman were sitting, hit Danielson in the head and then "kicked out sideways" and struck the leg of Ehrisman's chair. Doc. 1 at ¶¶ 54–57. Danielson also claims that in January 2012, Huether "entered the personal space of Tim Stanga and made aggressive physical gestures" after Stanga gave a presentation during a City Council meeting implying that the City's bidding and contracting practices were designed to conceal corruption. Doc. 1 at ¶¶ 59–60. Next, Danielson alleges that Huether assaulted Tom Hein in August 2016 after Hein sought "just compensation" for some of his property that had been improperly transferred "to another entity in support of a public works project." Doc. 1 at ¶ 65. Danielson alleges that Huether went to Hein's work where he "entered

the personal space of Tom Hein, committed battery upon Mr. Hein and then verbally assaulted him including threats that if he did not sign over property to a third party that he would 'squash you like a fly.'" Doc. 1 at ¶ 69. Finally, Danielson alleges that Huether struck City Council member Kenny Anderson in the back of the head during a City Council meeting in June 2015. Doc. 1 at ¶ 76. Danielson alleges that this assault "was apparently due to" Huether being upset that Anderson was not "controlling" the other City Council members the way Huether wanted. Doc. 1 at ¶ 76.

These allegations do not create a reasonable inference that the City had a custom of allowing Huether to retaliate against people for exercising their First Amendment rights. First, Danielson does not adequately allege that any policymakers for the City of Sioux Falls knew that Huether had allegedly retaliated against Ehrisman and Hein. Although Danielson alleges that "the numerous public allegations of deprivation of rights and complaints that the Mayor was assaulting persons put the City of Sioux Falls and State of South Dakota on notice regarding such violations," Doc. 1 at ¶ 142, none of the "public allegations" or "complaints" about assaults Danielson discusses in his complaint concern Hein or Ehrisman. Danielson's vague allegation that the City had notice that Huether was "assaulting persons" does not plausibly suggest that the City knew that Huether had assaulted Hein and Ehrisman. And while Danielson claims that Hitterdal witnessed the "assaults" on April 14, 2015, Doc. 1 at ¶ 58, he has not alleged any facts suggesting that she was a policymaker for the City of Sioux Falls.[13]

---

[13] A person of ordinary firmness would not be deterred from engaging in First Amendment activity simply because Huether "struck" that person's chair with his foot while leaving a City Council meeting. Thus, even if Hitterdal was a policymaker, the Ehrisman incident would provide little support to Danielson's claim that the City had a custom of allowing Huether to retaliate against people in violation of the First Amendment.

Second, Danielson also has failed to plausibly allege that policymakers for the City had notice that Huether had attempted to intimidate Danielson by standing near his car on four occasions. The closest Danielson comes to doing so is his allegation that "on multiple occasions [Danielson] filed a Notice of Harm with the City and thereby placed the City on official notice of the constitutional and other violations." Doc. 1 at ¶ 150. But the only "notices of harm" Danielson mentions in his complaint do not suggest that the City had notice of the instances of intimidation; the notices concerned the April 2015 alleged assault of Danielson, and Danielson filed them before any of the alleged instances of intimidation occurred. Doc. 1 at ¶¶ 36–37, 49. Danielson's allegation that the notices of harm he filed put the City on notice of "the constitutional and other violations" does not allow for the reasonable inference that the City knew about the alleged incidents of intimidation.

Third, Huether allegedly assaulted Anderson because he was upset that Anderson was not "controlling" the other council members the way Huether wanted, rather than because Anderson had exercised his First Amendment rights and criticized Huether. Danielson does allege any facts suggesting that Anderson had engaged in constitutionally protected speech or that Huether's alleged assault of Anderson was designed to chill Anderson's First Amendment expression. The alleged assault of Anderson therefore does not support the conclusion that the City had a custom of allowing Huether to retaliate against people for exercising their First Amendment rights. See Peterson v. City of Fort Worth, 588 F.3d 838, 851 (5th Cir. 2009) (explaining that a custom "requires similarity and specificity; prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question") (cleaned up).

Finally, although Danielson has adequately alleged that policymakers for the City knew of the Stanga incident and Huether's alleged assault of Danielson, these two incidents, occurring over

three years apart, do not plausibly show a custom of unconstitutional conduct so permanent and well-settled as to have the force of law. See Brewington v. Keener, 902 F.3d 796, 802 (8th Cir. 2018) (explaining that "in the face of an express municipal policy prohibiting excessive force," two instances of excessive force "cannot be considered a pattern of widespread and pervasive unconstitutional conduct"); Thomas v. Cook Cty. Sheriff's Dep't, 604 F.3d 293, 303 (7th Cir. 2010) (explaining that there is no clear consensus concerning how frequently misconduct must occur to impose liability under Monell, "except that it must be more than one instance or even three") (cleaned up).[14]

Danielson's final attempt at establishing municipal liability relies on Lozman v. City of Riviera Beach, 138 S. Ct. 1945 (2018), where the Supreme Court held that the plaintiff did not have to prove the absence of probable cause to sue a city for retaliatory arrest under the First Amendment. Lozman is a unique case. The plaintiff in Lozman claimed that the city, through its councilmembers, formed an official policy to retaliate against him for criticizing the councilmembers and suing the city. Id. at 1949, 1951. As evidence of this official policy, the plaintiff offered the transcript of a closed-door city council meeting during which a council member had suggested that the city use its resources to "intimidate" the plaintiff and others who sued the city. Id. at 1949. Comments by other council members indicated that they agreed with this suggestion. Id. The plaintiff claimed that the city executed this official policy when a council member ordered his arrest while he was speaking during a public meeting. Id. at 1949–50. The Supreme Court gave three main reasons why the plaintiff did not have to show the absence of

---

[14]Danielson alleges in his complaint that "[i]t is a policy, as evidenced by history, that the various law enforcement agencies such as the Sioux Falls police department and the South Dakota DCI will bystand and not investigate and not pursue prosecution of public officials and employees who assault citizens." Doc. 1 at ¶ 75. This is a legal conclusion and Danielson has not pleaded sufficient facts to make it plausible that such a policy or custom exists.

probable cause "on facts like these." Id. 1954–55. First, the fact that the plaintiff had to prove the existence and enforcement of an official policy motivated by retaliation distinguished his claim from the usual retaliatory arrest claim. Id. at 1954. According to the Court, "[a]n official retaliatory policy is a particularly troubling and potent form of retaliation, for a policy can be long term and pervasive, unlike an ad hoc, on-the-spot decision by an individual officer." Id. There is therefore a "compelling need for adequate avenues of redress" when a city has an official policy of retaliation. Id. Next, because this "unique class of retaliatory arrest claims . . . will require objective evidence of a policy motivated by retaliation to survive summary judgment," the Court dismissed concerns about a barrage of retaliatory arrest claims against city policymakers. Id. Third, because the official policy was allegedly in retaliation for protected activity occurring months before the plaintiff's arrest, there was little chance that the arrest was motivated by a legitimate consideration of speech. Id.

The Supreme Court issued Lozman after Danielson filed his complaint but before he responded to the motion to dismiss. Danielson argues in his brief that he has a claim under Lozman and asserts that he "will need an opportunity to amend his pleadings to enumerate any factors which were not pleaded in the first complaint." Doc. 18 at 5. The Defendants have not responded to Danielson's argument about Lozman, but that is understandable; the complaint contained almost no information about Danielson's arrest, the Defendants did not know that this Court would consider the allegations in Danielson's appendix, and Danielson mentioned Lozman for the first time in his response brief. Danielson does not have a viable Lozman claim based on the allegations of the complaint or matters claimed in Danielson's appendix.

**B.     RICO Claim**

36

RICO provides a private right of action for any person "injured in his business or property by reason of a violation of" 18 U.S.C. § 1962. 18 U.S.C. § 1964(c). Section 1962 prohibits four different types of activities, which can be summarized in general terms as follows. First, § 1962(a) makes it unlawful for a person who has received income derived from a pattern of racketeering activity to invest that income in an enterprise. Next, § 1962(b) prohibits the acquisition or maintenance of an interest in an enterprise through a pattern of racketeering activity. Third, § 1962(c) makes it unlawful for any person employed by or associated with an enterprise to conduct the enterprise's affairs through a pattern of racketeering activity. Fourth, § 1962(d) makes it unlawful to conspire to violate subsections (a), (b), or (c).

Danielson does not specify which subsection of § 1962 the Defendants allegedly violated. Regardless of whether Danielson is relying on subsection (a), (b), or (c), he must adequately plead a pattern of racketeering activity. 18 U.S.C. § 1962; First Nat'l Bank & Trust Co. v. Hollingsworth, 931 F.2d 1295, 1303 (8th Cir. 1991). RICO defines "racketeering activity" as numerous so-called predicate acts, including mail fraud, wire fraud, and violations of the Hobbs Act, 18 U.S.C. § 1951. 18 U.S.C. § 1961(1). To plead a pattern of racketeering activity, a plaintiff must allege "two or more related [predicate] acts . . . that 'amount to or pose a threat of continued criminal activity.'" Nitro Distrib., Inc. v. Alticor, Inc., 565 F.3d 417, 428 (8th Cir. 2009) (quoting Wisdom v. First Midwest Bank, 167 F.3d 402, 406 (8th Cir. 1999)).

Danielson alleges in his complaint and appendix that the Defendants engaged in a pattern of racketeering activity by committing wire fraud, mail fraud, and violating the Hobbs Act. See Doc. 1 at ¶¶ 72, 97, 124, 132–33; Doc. 18 at 26, 47–48.

### 1. Hobbs Act Violations

Section 1951 penalizes "[w]hoever . . . obstructs, delays, or affects commerce . . . by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section." § 1951. The Supreme Court has interpreted § 1951 as prohibiting only acts or threats of physical violence in furtherance of a plan or purpose to engage in robbery or extortion. Scheidler v. Nat'l Org. for Women, 547 U.S. 9, 23 (2006). Thus, "physical violence unrelated to robbery or extortion falls outside the scope of the Hobbs Act," even if the physical violence affects commerce in some way. Id. at 16–17. "Robbery" as defined in § 1951 "means the unlawful taking or obtaining of personal property from the person or in the presence of another." 18 U.S.C. § 1951(b)(1). Section 1951 defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." § 1951(b)(2).

Danielson contends that Huether violated § 1951(b)(2) by committing extortion under color of official right. He alleges that Huether "and his business co-conspirator operated a scheme to obtain preferential investment opportunities by using and abusing the Mayor's color of law powers and executive authority over a multiyear period." Doc. 1 at ¶ 108. According to Danielson, "a business venture desiring to increase the viability of the venture could bring in a member of the Mayor's family or a person at his direction and be reasonably assured of receiving profitable concessions from the City of Sioux Falls." Doc. 1 at ¶ 109; see also Doc. 18 at 38–39. As the Eighth Circuit has explained, the Hobbs Act "requires proof, among other elements, that the defendant received a benefit in exchange for the performance or nonperformance of an official act." United States v. Evans, 30 F.3d 1015, 1019 (8th Cir. 1994). A public official violates the

Hobbs Act when he "receives payment to which [he] was not entitled, knowing that the payment was made in return for official acts." United States v. Kalb, 750 F.3d 1001, 1004 (8th Cir. 2014) (quoting Evans v. United States, 504 U.S. 255, 268 (1992)). Danielson has not adequately alleged that Huether knew he was receiving a benefit in exchange for an official act. Danielson's complaint broadly alleges that Huether would grant concessions to businesses in exchange for favorable investment opportunities, but does not plead any specific facts to suggest that this actually occurred. Doc. 1 at ¶¶ 108–113. Although Danielson's appendix provides three examples of real estate deals that allegedly benefited Huether or his family members, Doc. 18 at 39–42, none of the allegations in the appendix allow for the reasonable inference that Huether knew that these benefits were given in exchange for him taking an official act to assist the real estate developers. Instead, Danielson simply alleges in each example that Huether "used his color of law powers to obtain a favorable investment opportunity benefiting himself or immediate relatives and other co-conspirators." Doc. 18 at 39–41. Danielson's allegations do no more than raise the mere possibility that Huether engaged in misconduct, which is insufficient under Iqbal and Twombly.

Danielson also claims that Huether's conduct towards Hein constituted extortion under § 1951(b)(2). Again, Danielson alleges that Huether assaulted Tom Hein in August 2016 after Hein sought "just compensation" for some of his property that had been improperly transferred "to another entity in support of a public works project." Doc. 1 at ¶ 65. Danielson alleges that Huether went to Hein's work where he "entered the personal space of Tom Hein, committed battery upon Mr. Hein and then verbally assaulted him including threats that if he did not sign over property to a third party that he would 'squash you like a fly.'" Doc. 1 at ¶ 69. These allegations present a closer call than Danielson's allegations about Huether giving concessions in return for investment

opportunities. As explained below, however, Danielson has failed to plead a pattern of racketeering activity even if he adequately pleaded that Huether attempted to extort Hein.

Danielson's next allegation is that his July 2014 arrest and the April 2015 assault violated § 1951 because these acts "depleted his assets and impaired his ability to . . . operate his business in interstate commerce." Doc. 18 at 28; see also Doc. 1 at ¶¶ 97, 116, 124; Doc. 18 at 47. But an act of violence does not violate § 1951 simply because it affects interstate commerce. Scheidler, 547 U.S. at 16–17. Rather, Danielson must show that the arrest and assault were in furtherance of a plan or purpose to engage in robbery or extortion. Id. Because the arrest and assault occurred well before Huether's interaction with Hein in August 2016, these acts could not have been in furtherance of any plan to extort Hein. And while Danielson alleges that Huether assaulted him and had him arrested for investigating Huether's misuse of his office to gain favorable investment opportunities, Danielson has not adequately pleaded that Huether committed extortion via the alleged investment scheme or that Huether had any plan to do so. Danielson has not alleged sufficient facts to make it plausible that the assault and arrest violated the Hobbs Act.

Danielson's final two claims under the Hobbs Act do not require much discussion. First, he alleges that his September 2014 prosecution violated the Hobbs Act because "it depleted the assets available to operate his business in interstate commerce." Doc. 18 at 47. The prosecution does not fall within the Hobbs Act because it was not a threat of violence or an act of violence, and Danielson has not adequately pleaded that the prosecution was in furtherance of a plan or purpose to engage in extortion. Second, Danielson alleges that "threats" to him violated the Hobbs Act, but does not explain what these threats were. If Danielson is claiming that Huether's alleged intimidation of him after the City Council meetings constituted a threat of physical violence in furtherance of extortion, this claim fails. The Hobbs Act makes it illegal to "threaten[] physical

violence." To "threaten" means to "make a threat or threats against." The New Shorter Oxford English Dictionary 3291 (3d ed. 1993). A "threat" is defined as a "communicated intent to inflict harm or loss on another or on another's property." *Threat*, Black's Law Dictionary (10th ed. 2014). Huether's standing by Danielson's car after the City Council meetings, without saying anything or making any sort of gesture, does not plausibly suggest that Huether was communicating an intent to inflict physical violence on Danielson. This holding does not conflict with this Court's refusal to find as a matter of law that Huether's conduct would not deter a person of ordinary firmness from engaging in protected speech. After all, the factfinder should decide the ordinary firmness question unless the retaliatory conduct "is so inconsequential that even allowing a claim would trivialize the First Amendment." Bennie, 822 F.3d at 398 n.2 (cleaned up).

### 2. Wire and Mail Fraud

A plaintiff relying on fraud as a predicate act under RICO must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); see also Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co., 48 F.3d 1066, 1069 (8th Cir. 1995) (applying Rule 9(b) to allegations of fraud used as predicate acts for RICO claims). "The circumstances of the fraud include such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." H & Q Props., Inc. v. Doll, 793 F.3d 852, 846 (8th Cir. 2015) (cleaned up). "Conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy [Rule 9(b)]." Drobnak v. Andersen Corp., 561 F.3d 778, 783 (8th Cir. 2009) (cleaned up). "When plead as RICO predicate acts, mail and wire fraud require a showing of: (1) a plan or scheme to defraud, (2) intent to defraud, (3) reasonable foreseeability that the mail or wires will be used, and (4) actual use of the mail or wires to further the scheme." Wisdom, 167 F.3d at 406.

Danielson alleges first that the City of Sioux falls committed wire and mail fraud by withholding discoverable documents in the matter of Zoning Adjustment Board BOA-003178-2015 Appeal and in <u>Save Our Neighborhood—Sioux Falls v. City of Sioux Falls</u>, 849 N.W.2d 265 (S.D. 2014). Doc. 1 at ¶¶ 125–33. These claims fail under the particularity requirement as neither the complaint nor the appendix explain what the withheld documents were, which particular Defendant withheld them, and when this withholding occurred. Moreover, Danielson has not alleged any facts suggesting that these documents were actually discoverable, that the Defendants purposefully withheld the documents, or that the Defendants had the intent to defraud someone.

Danielson's other claim of wire or mail fraud fares no better. He alleges that he has received "over ten citations" from the City but that none of these citations have resulted in a "conviction[]," that the City issued these citations in retaliation for Danielson exercising his First Amendment rights "to speak against City policies," and that the "vast majority of these citations . . . were based on interpretations of laws that the City knew or should have known were false." Doc. 18 at 48. Danielson claims that the citations constituted mail and wire fraud because the City "knew the citations . . . were based on fraudulent representations of the citations as valid." Doc. 18 at 48. Danielson does not plead enough facts about the citations to allow for the reasonable inference that they were somehow invalid or erroneous, fails to allege the circumstances of the fraud as required, and has not alleged sufficient facts to make it plausible that the Defendants had a plan or scheme to defraud him or the intent to do so. Danielson has failed to plead a pattern of racketeering activity, so he cannot state a claim under subsections (a), (b), or (c) of § 1962. Because Danielson has not stated a claim under subsections (a) through (c), he has likewise failed to state a RICO conspiracy claim under subsection (d). <u>First Capital Asset Mgmt., Inc. v.</u>

Satinwood, Inc., 385 F.3d 159, 182 (2d Cir. 2004); Rolfes v. MBNA Am. Bank N.A., 416 F. Supp. 2d 745, 754 (D.S.D. 2005).

### C.    State Law Claims

Danielson alleged state-law claims against Huether for assault, stalking, intentional infliction of emotional distress, and invasion of privacy. Doc. 1 at ¶¶ 33–34, 85–86. Defendants do not specifically argue that these allegations fail to state a claim but rather contend that "if the Court dismisses the underlying federal claims, it should decline to exercise supplemental jurisdiction over the remaining state law claims." Doc. 12 at 20. As explained above, however, this Court is not dismissing Danielson's First Amendment retaliation claims against Huether for the alleged assault and intimidation. These state-law claims survive the motion to dismiss as the Court has supplemental jurisdiction over them.

## IV.    Conclusion

For the reasons explained above, it is hereby

ORDERED that the Defendants' motion to dismiss, Doc. 11, is granted in part and denied in part, in that Danielson's § 1983 claims that Huether retaliated against Danielson for exercise of his First Amendment rights by striking him in the head and attempting to intimidate him after City Council meetings survive Defendants' motion to dismiss, as do Danielson's state-law claims against Huether. All of Danielson's other claims are dismissed for failure to state a claim. It is further

ORDERED that Huether answer the complaint within 21 days, after which the Court will send an order for a scheduling report. It is further

ORDERED that the Clerk of Court mail Danielson a copy of the Civil Local Rules of Practice for the District of South Dakota.

DATED this 19th day of December, 2018.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE