UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| BRUCE DANIELSON, | 4:18-CV-04039-RAL |
| Plaintiff, | |
| | OPINION AND ORDER GRANTING |
| vs. | MOTION FOR SUMMARY JUDGMENT |
| | AND DENYING MOTIONS TO STRIKE |
| MIKE HUETHER, | |
| Defendant. | |

Plaintiff Bruce Danielson, proceeding pro se, sued the State of South Dakota, South Dakota's then Attorney General Marty Jackley, the City of Sioux Falls (City), the City's former Mayor Mike Huether, and two City employees. Doc. 1. Danielson alleged that the Defendants violated 42 U.S.C. § 1983, the Racketeer Influenced and Corrupt Organizations Act, and state law. Doc. 1. Among other things, Danielson claimed that Huether assaulted him during an April 14, 2015 public City meeting in the Carnegie Town Hall and attempted to intimidate or provoke him after four other City Council meetings. In December 2018, this Court entered a lengthy opinion dismissing most of Danielson's complaint.[1] The only claims to survive were against Huether—a First Amendment retaliation claim based on Huether's alleged assault and intimidation of

---

[1] The claims dismissed included Danielson's claims that Huether and Jackley conspired to cover up Huether's assault on Danielson, that Huether conspired to use his power as mayor to create favorable investment opportunities for Huether's family, and that Huether instigated Danielson's arrest and prosecution.

1

Danielson after the four City Council meetings and claims under state law concerning this same conduct. Doc. 22.

Huether has now moved for summary judgment, Doc. 90, and Danielson has submitted a brief and other filings opposing the motion, including ten motions to strike affidavits, Docs. 107–116, 118–20, 123. Two of the elements Danielson must show to succeed on his First Amendment retaliation claim are that Huether's alleged assault was motivated at least in part by Danielson's protected activity and that Huether's encounters with him after the City Council meetings would chill the speech of a person of ordinary firmness. This Court grants Huether's motion for summary judgment because no reasonable jury could find in Danielson's favor on either of these elements.

## I.      Motions to Strike

Huether filed affidavits from ten individuals to support his motion for summary judgment: himself, James Moore, Jerry Jongeling, Kenny Anderson Jr., Lorie Hogstad, Dean Karsky, Tracy Turbak, Sue Quanbeck Etten, Jon Klemme, and Heather Hitterdal. Docs. 93, 94, 96–103. Danielson moved to strike all ten of these affidavits. Docs. 107–116. He argues that the affidavits are untimely and beyond the scope of disclosure and that admitting them would violate the best evidence rule and spoliation principles. He also makes arguments specific to certain affidavits.

### A.  The affidavits were not untimely or beyond the scope of disclosure.

Citing Rule 37(c) of the Federal Rules of Civil Procedure, Danielson argues that all the affidavits must be struck because Huether did not disclose them until after discovery ended. Broadly speaking, Rule 26 of the Federal Rules of Civil Procedure requires initial disclosure of witnesses and documents that the disclosing party "may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(i)–(ii). Rule 26(e) imposes a duty to supplement or correct these initial disclosures if they end up being incorrect or incomplete and "the additional or corrective

2

information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A).  Rule 37(c) gives teeth to Rule 26.  It authorizes sanctions, including exclusion of evidence or witnesses left out of required disclosures, unless the failure to disclose "was substantially justified or is harmless."[2] Fed. R. Civ. P. 37(c)(1).

Contrary to Danielson's belief, the affidavits used to support Huether's motion for summary judgment did not need to be disclosed before the discovery deadline. Burton v. Blue Cross & Blue Shield of Kansas City, No. 13-2099-JTM, 2014 WL 3767683, at *2 (D. Kan. July 31, 2014) ("The plaintiff has presented no authority suggesting the requirement to timely disclose documents under Rule 26 somehow precludes a party from offering subsequently-obtained affidavits in support of a summary judgment motion."); Dupee v. Klaff's, Inc., 462 F. Supp. 2d 233, 235 n.2 (D. Conn. 2006) ("[A]ffidavits appearing to have been created for summary judgment purposes are not required to be disclosed during discovery (as they likely did not exist then) . . . ."). Indeed, all but one of the affidavits Danielson moves to strike were created after discovery ended, and therefore could not have been disclosed before the deadline.

Danielson also argues that most of the affidavits should be struck because they "exceed the scope of" or are "broader than" the witness disclosures Huether provided. Danielson filed Huether's Rule 26 disclosures but does not explain how each witness's affidavit exceeds the scope of these disclosures.  Rule 26(a) requires parties to disclose "each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(i).  The rule does not

---

[2]Courts disagree on whether exclusion is mandatory or optional when the failure to disclose was not substantially justified or harmless. See Vanderberg v. Petco Animal Supplies Stores, Inc., 906 F.3d 698, 703 n.3 (8th Cir. 2018). The Eighth Circuit has not decided which approach is proper, id., although its decision in Vanderberg suggests that a court could impose a lesser sanction than exclusion so long as the offending party filed a motion invoking the court's discretion, id. at 705.

require parties "to provide a detailed narrative of all the facts known to each witness; a brief description of the general topics of each witness' [sic] knowledge will suffice." Tift v. Ball, No. C07-0276RSM, 2007 WL 3047228, at *1 (W.D. Wash. Oct. 18, 2007) (citation omitted). Huether listed eight of the affiants—himself, Anderson, Hogstad, Karsky, Turbak, Quanbeck Etten, Klemme, and Hitterdahl—in his Rule 26 disclosures and briefly described the information these individuals possessed.[3] This Court has reviewed the disclosures and the affidavits and finds that the affidavits do not exceed the scope of the brief descriptions Rule 26 required Huether to provide.

Danielson also argues that admitting the affidavits would prejudice him because he did not have an opportunity to cross examine the affiants. Despite having ample time for discovery, Danielson deposed no witnesses in this case and did not serve any written discovery beyond four subpoenas he issued in November and December of 2019. Doc. 106 at 2–3, 6. Although Danielson requested more time for discovery, this Court denied this request because he could not show that he had been diligent in trying to meet the discovery deadline. Doc. 106. Except for Jongeling and Moore, Danielson could have deposed all the affiants before discovery closed. His failure to do so is not a basis for striking the affidavits.

**B. The best evidence rule does not apply, and Danielson is not entitled to sanctions for spoliation.**

Anderson, Hogstad, Karsky, Turbak, Quanbeck Etten, and Hitterdal swore in affidavits that they did not see Huether strike Danielson during the April 14, 2015 meeting. Huether swore in

---

[3]Danielson seems to suggest in some of his briefs that the affiants themselves were not disclosed until after discovery closed. However, Huether's Rule 26 disclosures show that, except for Jongeling and Moore, all the affiants were disclosed. Moreover, Moore did not need to be disclosed because he did not have "discoverable information" that Huether was going to use to support his defense. Rather, his affidavit provided links to publicly available videos of City Council meetings and summarized how often Danielson spoke at the meetings and what he said on a few occasions.

his affidavit that he did not strike Danielson. Danielson argues that these affidavits must be struck under the best evidence rule and spoliation principles because "the Defendants destroyed all of the videos from security or hidden cameras relating to the April 14th, 2015 incident."

Danielson's argument under the best evidence rule is a nonstarter. The best evidence rule only applies when the contents of a writing, recording, or photograph are sought to be proved. Fed. R. Evid. 1002 ("An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise."); Jackson v. Crews, 873 F.2d 1105, 1110 (8th Cir. 1989). It does not apply when witnesses testify about their personal knowledge of an event, even if a recording of the event happens to exist. United States v. McKenzie, 505 F. App'x 843, 846 (11th Cir. 2013) (per curiam); Waterloo Furniture Components, Ltd. v. Haworth, Inc., 467 F.3d 641, 648–49 (7th Cir. 2006); United States v. Workinger, 90 F.3d 1409, 1415 (9th Cir. 1996) (explaining that the best evidence rule has "no application at all" when a tape recording of a conversation exists but a party seeks to call a participant in or observer of the conversation to testify about the conversation). The affidavits of Huether, Anderson, Hogstad, Karsky, Turbak, Quanbeck Etten, and Hitterdal were based on their first-hand knowledge of the April 14, 2015 meeting, not on their knowledge of any allegedly destroyed video. Because their affidavits were not based on the content of any video, the best evidence rule does not apply. That leaves Danielson's spoliation argument.

The only law Danielson cites for this argument is Blazer v. Gall, 1:16-CV-01046-KES, 2019 WL 3494785 (D.S.D. Aug. 1, 2019), a case in which this Court applied Federal Rule of Civil Procedure 37(e) to determine whether a party should be sanctioned for destroying electronically-stored video recordings. Rule 37(e) establishes sanctions courts may impose if electronically stored information (ESI) is lost, and describes the findings needed to justify these sanctions. Fed.

R. Civ. P. 37(e). Possible sanctions under the rule include a presumption that the lost information was unfavorable to the offending party and a jury instruction to the same effect. Id.

However, this Court cannot impose any sanctions under Rule 37(e) unless Danielson first shows that (1) ESI was lost; (2) the ESI "should have been preserved in the anticipation or conduct of litigation"; (3) that the party responsible for preserving the ESI failed to take reasonable steps to do so; and (4) that the ESI cannot be "restored or replaced through additional discovery." Id.; see also Blazer, 2019 WL 3494785, at *3 (listing these predicate elements of Rule 37(e)); Borum v. Brentwood Vill., LLC, 332 F.R.D. 38, 43 (D.D.C. 2019) (stating that the party alleging spoliation under Rule 37(e) bears the burden of proof). Courts apply the preponderance-of-the-evidence standard to motions for sanctions under Rule 37(e). Ellis v. Hobbs Police Dep't, No. 17-1011 KWR/GBW, 2020 WL 1041688, at *5 (D.N.M. Mar. 4, 2020) (applying preponderance of evidence standard to motion for spoliation sanctions under Rule 37(e)); Putscher v. Smith's Food & Drug Ctrs., Inc., No. 2:13-CV-1509-GMN-VCF, 2014 WL 2835315, at *6–7 (D. Nev. June 20, 2014) (applying preponderance of the evidence standard to determine whether surveillance footage of plaintiff's fall existed).

The key question here is whether Danielson can show by a preponderance of the evidence that a video captured by a "security" camera actually existed. He argues that the report of the South Dakota Division of Criminal Investigation (DCI) concerning his allegations against Huether shows that such a video did exist.[4] According to the report, Hogstad, the City Clerk, told the DCI back on May 5, 2015, that the "city council chambers" had three main ceiling-mounted cameras;

---

[4]The report says that the DCI became involved because Danielson did not want to deal with the Sioux Falls Police Department as he believed it had a conflict of interest. Doc. 66-1 at 9. The DCI agent who authored the report concluded that it was "apparent there is no evidence that a crime was committed." Doc. 66-1 at 6.

that these cameras operated only when meetings were in session; and that the video from these cameras was archived and uploaded to the City's website. Doc. 66-1 at 12. Hogstad also told the DCI that the "council chambers" had one ceiling-mounted "security camera," and that this camera "covers the entire room," runs "24/7," and was linked to other security cameras in the building. Doc. 66-1 at 12. She said that the security cameras were on a "separate system from the three cameras used to post video on the internet." Doc. 66-1 at 12.

On May 6, 2015, the DCI spoke with Quanbeck Etten, the Director of Central Services for Sioux Falls, and Klemme, the City's IT Manager. Doc. 66-1 at 13. According to the report, the DCI agent explained why he was looking for video and was told that "the only video that would show that particular location on a regular basis would be the security video." Doc. 66-1 at 13. Klemme, whom the report says oversaw the security cameras, said that he thought storage for those cameras was "approximately seven days and the information is then overwritten." Doc. 66-1 at 13. Klemme said that the security cameras at the Carnegie Annex transmit to a storage system at the downtown Sioux Falls Library and that John Schaeffer at Midwest Alarm maintained the system. Doc. 66-1 at 13. The DCI agent spoke with Schaeffer the next day. Doc. 66-1 at 14. Schaeffer explained that the system the City used for those security cameras maintained the recordings for five to seven days before it rewrites over the recordings and they become unrecoverable. Doc. 66-1 at 14. Schaeffer looked for videos on the system but the oldest information he could find was from April 30, 2015. Doc. 66-1 at 14.

Danielson also cites to an affidavit from former City Council member Greg Jamison. Jamison averred that Danielson called him "on or about" April 15, 2015, said that Huether had assaulted him as he left the council chamber the day before, and asked Jamison to have "all the videos saved." Doc. 72-1 at 15. Jamison said that he asked the City Council staffer, Jim David,

7

whether the videos could be saved for Danielson and David told him to call the police chief. Doc. 72-1 at 15. According to the affidavit, Jamison told then Chief of Police Doug Barthel about Danielson's assault claim and asked that all videos be saved. Doc. 72-1 at 15. Jamison testified during his deposition that he learned from other City employees that there were security cameras that covered the room, that he had not known about these security cameras before, that he had looked and could "see the little bubbles of where those cameras were," and that the police department controlled and managed these cameras. Doc. 87-1 at 13–14.

Huether submits that video evidence of the alleged assault never existed. He submitted an affidavit from Klemme stating that in 2015, the City used an AV-recording system called SIRE to record City meetings at Carnegie Town Hall; that the SIRE cameras were the only cameras in operation in the Carnegie Town Hall meeting room in 2015; that there were three SIRE cameras in the rear of the room and one camera positioned to the right of the public dais; that the SIRE camera system operator would manually switch between the cameras to create the best experience for viewers; and that the SIRE cameras only recorded what the camera operator displayed for broadcast, meaning that not all SIRE cameras recorded simultaneously and that there were not separate video recordings from each angle. Doc. 101 at ¶¶ 2, 4, 5. Klemme also averred that there was not a separate "security" camera in the Carnegie Town Hall meeting room and that there was no security camera outside the room that would have recorded events inside the room. Doc. 101 at ¶¶ 6–7. Quanbeck Etten stated in an affidavit that she agrees with the statements in Klemme's affidavit. Doc. 100 at ¶ 3.

Danielson has not shown by a preponderance of the evidence that a video captured by a security camera ever existed. True, some of the statements in the DCI report suggest that the Carnegie Town Hall meeting room may have had a security camera. And the affidavits from

8

Klemme and Quanbeck Etten do not explain the apparent discrepancy between the statements they presumably made to the DCI agent and the statements they make now. Nevertheless, the statements in the DCI report cannot do the heavy lifting Danielson would like them to. First, these statements are all hearsay and Danielson has not shown that any exceptions or exclusions apply. See United States v. Taylor, 462 F.3d 1023, 1026 (8th Cir. 2006) (holding that statements by a citizen contained in a police report were not admissible). Second, Danielson had a copy of the DCI report by early April 2019, yet chose not to depose Klemme, Quanbeck Etten, Hogstad or any other witness. He cannot now use hearsay to establish that a security camera captured the alleged assault when he had ample opportunity to try to prove this through admissible evidence.[5] Jacobsen v. California, 1:14-cv-00108-JLT (PC), 2017 WL 2654749, at *3 (E.D. Cal. June 20, 2017) (refusing to consider hearsay statements offered by plaintiff to support his claim that there was a surveillance video of him being subjected to excessive force); see also Doe v. Cty. of San Mateo, No. 3:15-cv-05496-WHO, 2017 WL 6731649, at *7–8 (N.D. Cal. Dec. 29, 2017) (holding that the plaintiff had failed to establish that spoliation occurred even though the defendants' testimony about the video recording was inconsistent with their later affidavits saying that no recording existed); Okezie v. Prince George's Cty., No. DKC-13-0168, 2014 WL 1429183, at *3 (D. Md. Apr. 11, 2014) (finding that the plaintiff had failed to establish that a video existed despite the defendants having initially said that such a video existed and the defendants' inability to explain why the camera that should have captured the video malfunctioned).

---

[5]This Court recognizes that "the standard is not whether the evidence at the summary judgment stage would be admissible at trial—it is whether it *could* be presented at trial in an admissible form." Gannon Int'l, Ltd. v. Blocker, 684 F.3d 785, 793 (8th Cir. 2012). The DCI report could not be admitted for the truth of the matters asserted therein under the hearsay rule.

Jamison's affidavit and testimony are also insufficient to satisfy the preponderance-of-the-evidence standard.   Jamison's testimony makes clear that he did not know much about the supposed security cameras, and that most of what he did know came from what other City employees told him.   Doc. 87-1 at 13–14.   Jamison's statements do not outweigh the affidavits of Quanbeck Etten and Klemme, individuals who had direct knowledge of the cameras in the Carnegie Town Hall meeting room.

Regardless, sanctions wouldn't be automatic even if Danielson had shown that there was video from a security camera in the Carnegie Town Hall meeting room.   Rule 37(e) authorizes two types of sanctions.   First, if the court finds that the loss of ESI prejudiced a party, it "may order measures no greater than necessary to cure the prejudice."   Fed. R. Civ. P. 37(e)(1).   Second, where the court finds that the offending "party acted with the intent to deprive another party of the information's use in the litigation," the court "may" impose more severe sanctions, including adverse presumptions or jury instructions.   Id. at 37(e)(2).   Sanctions under Rule 37(e) are not mandatory, and indeed district courts have the discretion to forgo ordering any sanctions at all. See Barbera v. Pearson Educ., Inc., 906 F.3d 621, 628 (7th Cir. 2018) (stating that relief under Rule 37(e)(2) "was discretionary" even if the district court had found that the offending party acted with intent).

This Court would not order sanctions under either subsection of Rule 37(e) even if there were security camera footage from the Carnegie Town Hall meeting room.   Under Rule 37(e)(1), courts have "discretion to determine how best to assess prejudice in particular cases."   Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment.   Some courts have found prejudice where the missing ESI would have been relevant to the movant's case, Paisley Park Enters., Inc. v. Boxill, 330 F.R.D. 226, 236 (D. Minn. 2019), while others have required proof that the ESI

would "affirmatively support" the movant's claim, <u>Ungar v. City of New York</u>, 329 F.R.D. 8, 15 (E.D.N.Y. 2018); <u>see also</u> <u>Freidig v. Target Corp.</u>, 329 F.R.D. 199, 209 (W.D. Wis. 2018) (explaining that a movant does not suffer prejudice if the evidence suggests that the lost ESI "would have been detrimental or inconsequential" to the movant's claim). Judging prejudice by relevance alone is not appropriate under the unique circumstances here. Danielson makes the far-fetched claim that Huether, while exiting a City meeting, struck him in the back of his head so violently that he sustained damage to his head, neck, and teeth. Doc. 1 at ¶¶ 33–35. However, Danielson has not produced any witnesses to this assault, even though it allegedly occurred as part of a public meeting, where multiple people were present, and as Huether was exiting the room with a group of his staff. Indeed, Danielson did not even bother to depose any of the witnesses who might have seen the assault. Huether, on the other hand, offered affidavits from people who were at the meeting indicating that he never assaulted Danielson.[6] Given the extraordinary nature of Danielson's claim and the dearth of corroborating evidence, this Court would not find that Danielson was prejudiced by the loss of the ESI, if it ever existed at all. And even if there was some prejudice, it would not be enough to justify striking the affidavits of those who attended the April 14, 2015 meeting. <u>See</u> Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment ("[A]uthority to order measures no greater than necessary to cure prejudice does not require the court to adopt measures to cure every possible prejudicial effect.").

Danielson also wouldn't be entitled to sanctions under Rule 37(e)(2) because he has not produced sufficient admissible evidence that Huether "acted with the intent to deprive" him of the security video's use in this litigation. The result would be the same even if this Court considered the hearsay statements in the DCI report; there is no evidence that Huether knew that any security

---

[6]The evidence the parties offered on the alleged assault is discussed in greater detail below.

footage existed or would be overwritten, that Huether or anyone acting on his behalf took active steps to destroy security footage,[7] or that the footage, if it existed at all, was destroyed in a manner inconsistent with the normal overwriting procedure.

### C. The failure to disclose Jongeling as a witness was harmless.

Huether contravened Rule 26 by not disclosing Jongeling as a witness during discovery. Danielson argues that Jongeling's affidavit should therefore be struck under Rule 37(c). Again, that Rule authorizes sanctions unless the nondisclosure "was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Huether's failure to disclose Jongeling as a witness was harmless. Jongeling's affidavit concerns the streetlights in the area where Huether allegedly attempted to intimidate Danielson after City Council meetings. Doc. 94. Jongeling—the Traffic, Light, and Power Superintendent for the City—identified the number of lights on each street and explained that he searched his records and found no indication that these lights were not working on the dates Huether allegedly tried to intimidate Danielson. Huether offered Jongeling's affidavit to "contradict the impression from Danielson's complaint that Huether encountered him in some dark alleyway." Doc. 122 at

---

[7]There is no evidence that Huether directed destruction of any ESI. According to the DCI report, Huether told the DCI agent that Barthel had called him "early on" and said that Huether may be getting a phone call from the DCI about allegations by Danielson. Doc. 66-1 at 16. Huether said he had lunch with Bob Litz a few days later, and that Litz told Huether about Danielson's allegations. Doc. 66-1 at 16. Huether recalled that a week or so after his lunch with Litz, his communications specialist said law enforcement was gathering tapes of the meeting, and he told her to give them whatever they wanted. Doc. 66-1 at 16. Courts ordinarily analyze the attribution of fault to one party for another's spoliation under principles of agency. See Bush v. Bowling, No. 19-CV-00098-GKF-FHM, 2020 WL 5423986, at *7 (N.D. Okla. Sept. 10, 2020) ("[T]he current trend among district courts appears to be to impute liability for an agent's spoliation to the principal based on traditional notions of agency law, in which a defendant principal exercises control and authority over its third-party agent who possess the spoliated evidence." (cleaned up and citation omitted)). Danielson has presented no evidence that, if ESI was destroyed or overwritten, Huether personally or an agent of Huether did so.

4. However, Danielson neither alleged in his complaint nor testified that the streetlights were not working. See Doc. 1 at ¶¶ 80–84; Doc. 93-2 at 21–24. And while Huether cites Jongeling's affidavit to establish that the location of his alleged encounters with Danielson was "well-lit," this Court will not consider that fact as undisputed. In any event, Jongeling's affidavit concerns a very minor issue and was not material to this Court's decision on the motion for summary judgment. Danielson was not prejudiced by Huether's failure to disclose Jongeling, and his motion to strike Jongeling's affidavit is denied.

### D. There is no basis for striking Moore's affidavit.

James Moore is Huether's attorney. Paragraphs 2 through 8 of Moore's affidavit concern the frequency with which Danielson spoke at the public-input portion of City Council meetings and the topics he discussed at some of these meetings. Doc. 93 at ¶¶ 2–8. Moore based these paragraphs on his review of videos and minutes from City Council meetings, which are publicly available on the City's website. Doc. 93 at ¶¶ 2–8. When Moore described what Danielson said at a particular meeting, he also provided a link to the video of that meeting. Doc. 93 at ¶¶ 3–8.

Danielson argues that Moore's affidavit is improper "summary" evidence that does not meet the requirements of Federal Rule of Evidence 1006. Rule 1006 permits the use of a "summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. Summaries are admissible under Rule 1006 "when (1) they fairly summarize voluminous trial evidence; (2) they assist the jury in understanding the testimony already introduced; and (3) the witness who prepared it is subject to cross-examination with all documents used to prepare the summary." United States v. Fechner, 952 F.3d 954, 959 (8th Cir. 2020). The Eighth Circuit has said that Rule 1006 appears to contemplate that the summary "will have been prepared by a witness available for cross-

examination, not by the lawyers trying the case." United States v. Grajales-Montoya, 117 F.3d 356, 361 (8th Cir. 1997).

Danielson's motion to strike Moore's affidavit is denied. Paragraphs 4 through 8 of Moore's affidavit do not summarize voluminous writings or recordings. Instead, they present what Danielson said at particular meetings. The videos of these meetings are admissible, and this Court has watched the videos to determine what Danielson said rather than accepting Moore's characterization of the videos. Paragraphs 2 and 3 of Moore's affidavit are broader; paragraph 2 addresses how often Danielson spoke during the public-input portion of City Council meetings from January 2015 to March 2020, while paragraph 3 states that out of all the times Danielson spoke, he only mentioned the alleged assault four times. Doc. 93 at ¶¶ 2–3. Danielson argues that paragraphs 2 and 3 violate Rule 1006 because Moore is an attorney and has not been subject to cross-examination. However, "the standard is not whether the evidence at the summary judgment stage would be admissible at trial—it is whether it *could* be presented at trial in an admissible form." Gannon Int'l, Ltd. v. Blocker, 684 F.3d 785, 793 (8th Cir. 2012). This Court will not strike paragraphs 2 and 3 because the videos and City Council meeting minutes would be admissible at trial and Huether could submit a summary exhibit that complies with the Eighth Circuit's requirements. See Schmidt v. DIRECTV, LLC, No. 14-3000 (JRT/TNL), 2017 WL 3575849, at *1, 8 (D. Minn. Aug. 17, 2017) (denying motion to strike declaration by attorney that summarized evidence produced by opposing party because the declaration did need to comply with Rule 1006 at the summary judgment stage).

Danielson's real complaint about paragraphs 2 and 3 seems to be that they are not fair "summaries"; he provides his own summary of how many times he spoke at City Council meetings, Doc. 107-1 at 2–24, and argues that paragraph 3 is prejudicial because it suggests that

he did not adequately complain about the assault, Doc. 107 at 2. These arguments do not justify

striking paragraphs 2 and 3.

## II.   Facts

This Court takes the facts primarily from those portions of Huether's Statement of

Undisputed Material Facts not being disputed by Danielson and Danielson's Partial Statement of

Undisputed Material Facts, with a few caveats. First, this Court considers a fact undisputed where

Danielson's only objection to the fact is that it is based on an inadmissible affidavit. As explained

above, this Court has denied all Danielson's motions to strike Huether's affidavits. Second, this

Court considers a fact undisputed where Danielson did not cite to the record to support his

objection to the fact and the fact is otherwise established in the record. Local Rule 56.1(B) requires

a party opposing a motion for summary judgment to "respond to each numbered paragraph in the

moving party's statement of material facts with a separately numbered response and appropriate

citations to the record." D.S.D. Civ. LR 56.1(B); see also Fed. R. Civ. P. 56(e)(2) (saying that the

court can consider a fact undisputed when a party "fails to properly address another party's

assertion of fact as required by Rule 56(c)"). A failure to cite to the record when disputing a fact

may result in the fact being deemed admitted. Flora v. Custer Reg'l Med. Clinic, No. CIV. 06-

05031AWB, 2008 WL 4724316, at *3 (D.S.D. Oct. 24, 2008). Third, this Court will not take as

true those paragraphs from Danielson's Partial Statement of Undisputed Material Facts that are

not supported by citations to the record. When a nonmoving party like Danielson chooses to file

a separate statement of material facts, this Court's local rules require that he support those facts

with citations to the record. See Sancom, Inc. v. Qwest Commc'n Corp., No. CIV. 07-4147-KES,

2010 WL 299477, at *2 (D.S.D. Jan. 21, 2010). Fourth, some of Danielson's objections to

Huether's Statement of Undisputed Material Facts concern minor quibbles with wording or

reference additional facts that do not undermine the accuracy of the initial statement.  See, e.g., Doc. 119 at ¶¶ 3, 5–7, 10, 18, 21, 26.  In such instances, this Court considers the fact undisputed.

### A.  Background

Huether served as the Mayor of Sioux Falls from May 2010 to May 2018.  Doc. 91 at ¶ 2; Doc. 119 at ¶ 2.  As part of his duties, Huether presided over Sioux Falls City Council meetings. Doc. 91 at ¶ 3; Doc. 119 at ¶ 3.  These meetings include a segment called "public input," during which citizens can speak to the City Council for five minutes each on a chosen topic.  Doc. 91 at ¶¶ 5–6; Doc. 119 at ¶¶ 5–6.  The City Council also holds informational meetings, at which the City Council Chair typically presides.  Doc. 91 at ¶ 7; Doc. 119 at ¶ 7.  In April 2015, the City Council Chair was Counselor Dean Karsky.  Doc. 91 at ¶ 8; Doc. 119 at ¶ 8.

Danielson, a Sioux Falls resident, is a long-time advocate for open government and public access to government information.  Doc. 1 at ¶ 30; Doc. 91 at ¶ 10; Doc. 119 at ¶ 10.  He frequently attends City meetings, presentations, and press conferences, and is a regular speaker during public input.  Doc. 91 at ¶¶ 11–12; Doc. 119 at ¶¶ 11–12.   Danielson records most, but not all, of the City's public events that he attends.  Doc. 91 at ¶ 14; Doc. 119 at ¶ 14.  He contributes articles, commentary, and videos of public events to www.southdacola.com, a blog owned and operated by Scott Ehrisman.  Doc. 91 at ¶ 17; Doc. 119 at ¶ 17.  Danielson also has his own YouTube video blog where he stores and posts his videos.  Doc. 91 at ¶ 18; Doc. 119 at ¶ 18.  He testified that he has saved nearly 5,000 videos he took of public meetings, Doc. 93-2 at 6, although he later clarified that some of the videos did not involve Huether or the City of Sioux Falls and that many of the saved videos were simply reposts from the City or county rather than video he recorded himself, Doc. 91 at ¶ 19; Doc. 119 at ¶ 19.

Danielson was generally critical of Huether, his administration, and its projects. Doc. 91 at ¶ 21; Doc. 119 at ¶ 21. For instance, Danielson opposed the City Administration Building, one of the Huether Administration's public projects; he created a group called "Stop the Funding" and was involved in a lawsuit against the City Clerk challenging the project. Doc. 91 at ¶ 22; Doc. 119 at ¶ 22. Danielson made "Stop the Funding" paraphernalia and placards to wear and display during City Council meetings. Doc. 91 at ¶ 24; Doc. 119 at ¶ 24. Danielson also lodged three ethics complaints against Huether in March of 2014. Doc. 91 at ¶ 25; Doc. 119 at ¶ 25. He alleged that Huether was using the State-of-the-City Address and City resources to campaign for reelection. Doc. 91 at ¶ 26; Doc. 119 at ¶ 26. The Ethics Board dismissed Danielson's complaints as frivolous.[8] Doc. 91 at ¶ 26; Doc. 119 at ¶ 26.

Hitterdal, who had observed Danielson during her employment with the City, averred that he seemed "fixated" on Huether. Doc. 102 at ¶ 7; Doc. 91 at ¶ 27; Doc. 119 at ¶ 27. Ehrisman, one of Danielson's friends and someone he listed as a witness in the case, agreed that Danielson was obsessed with Huether:

> **Huether's Attorney**: Do you think that Mr. Danielson is at all obsessed with Mayor Huether?
> **Ehrisman**: I would say yes to that question, but when—I guess when certain people do things to you, you have a reaction to it. And I think if somebody threw me in jail on a penny bond over a raspberry bush, took me to court, cost me $10,000 to fight it,[9] hit me in the head, I think you would have some obsession, too.

---

[8]Danielson argues that there were some improprieties with how the Ethics Board considered his complaints, but these issues aren't material to this case and don't undermine the truth of ¶ 26 of Huether's statement of undisputed material facts. Danielson also argues that one of his complaints was dismissed for "lack of confidentiality" rather than for being frivolous. Doc. 119 at ¶ 26. However, the document Danielson cites does not bear this out.

[9]One of the dismissed claims in Danielson's complaint was that Huether had Danielson arrested and prosecuted in 2014 for having code violations at his property in retaliation for Danielson exercising his First Amendment rights. When asked during his deposition whether he had any facts to support this allegation, the only thing Danielson could point to was that he had asked Huether to help him resolve his "code enforcement issues" and that sometime before 2014, Huether

Doc. 91 at ¶ 28; 119 at ¶ 28; Doc. 93-4 at 15; Doc. 119-1 at 53.  Huether recalled an incident where

Danielson followed him around with his camera at an event for the opening of the Sanford Sports

Complex. Doc. 91 at ¶ 29; Doc. 119 at ¶ 29.  Huether ignored Danielson but described his behavior

at the event as being "odd." Doc. 91 at ¶ 29; Doc. 119 at ¶ 29; Doc. 103 at ¶ 10.

## B.  April 14, 2015 informational meeting

On April 14, 2015, Huether, along with various members of his administrative staff and

other project-team members, attended the informational meeting in the Carnegie Town Hall

Council Chamber. Doc. 91 at ¶ 32; Doc. 119 at ¶ 32.  Turbak and Quanbeck Etten presented the

Huether administration's proposal to build the City Administration Building.  Doc. 91 at ¶ 33;

Doc. 119 at ¶ 33.  The presentation lasted approximately 48 minutes. Doc. 91 at ¶ 34; Doc. 119 at

¶ 34. Hogstad, the City Clerk, then began setting up to present on the Election Review Committee,

a group established by Minnehaha County to address election issues. Doc. 91 at ¶ 35; Doc. 119 at

¶ 35.  Danielson and Debra Elofson were both members of the Election Review Committee.  Doc.

91 at ¶ 36; Doc. 119 at ¶ 36.

At the end of Turbak's presentation, and as Hogstad was preparing her presentation,

Huether—who according to Danielson was seated on the right side (facing the Council) in the

middle near the center aisle—exited the meeting room by walking down the center aisle, behind

the audience, and through the public exit with at least some of the administration staff who attended

the meeting for the presentation. Doc. 91 at ¶ 37; Doc. 119 at ¶ 37.  Danielson was seated in the

back row, on the left side of the room facing the City Council, three seats in from the side of the

aisle closest to the public exit door.  Doc. 91 at ¶ 38; Doc. 119 at ¶ 38.  The chair to Danielson's

---

had told Danielson that he had been "keeping track" of what had "been going on" with Danielson's case. Doc. 93-2 at 25.

immediate left was empty and Ehrisman was seated in the end seat. Doc. 91 at ¶ 39; Doc. 119 at ¶ 39. Elofson was seated to Danielson's right.[10]  Doc. 91 at ¶ 40; Doc. 119 at ¶ 40.

Danielson testified that as Huether was walking behind him to leave the meeting room, Huether struck Danielson in the back of the head with his elbow and then kicked the chair Ehrisman was sitting in. Doc. 91 at ¶ 43; Doc. 119 at ¶ 43. Danielson did not see Huether strike him, but when he turned to the left, he saw "Huether pulling his elbow back into his side." Doc. 91 at ¶ 44; Doc. 119 at ¶ 44. Huether did not say anything and continued out of the room without stopping. Doc. 91 at ¶ 45; Doc. 119 at ¶ 45. Danielson said nothing during the remainder of the meeting to either Elofson or Ehrisman about being hit.[11]  Doc. 91 at ¶ 46; Doc. 119 at ¶ 46.

Near the end of Hogstad's presentation on the Election Review Committee, Danielson, who was the chairman of the Committee, was asked a question by Councilor Christine Erickson. Doc. 91 at ¶ 68; Doc. 119 at ¶ 68.  Danielson walked up to the podium, answered her questions, and made no comments about the assault he claims happened earlier in the meeting. Doc. 91 at ¶ 69; Doc. 119 at ¶ 69; Doc. 103 at ¶ 5.  From this Court's viewing of the video of the meeting, Danielson answered questions clearly and coherently.

Danielson claims that Huether's assault broke his tooth and caused a flair up of his TMJ.[12] Doc. 91 at ¶ 48; Doc. 119 at ¶ 48; Doc. 118 at ¶¶ 13, 15.  He testified that he had to get a gold crown on the broken tooth, do prescribed exercises to get his jaw back in alignment, and take

---

[10]Ehrisman testified that he, Danielson, and Elofson were seated in relatively the same configuration, but closer to the center aisle. Doc. 91 at ¶ 41; Doc. 119 at ¶ 41. Elofson's testimony about where she, Danielson, and Ehrisman were sitting was relatively consistent with Danielson's testimony. Doc. 91 at ¶ 42; Doc. 119 at ¶ 42.

[11]Danielson claims that "Meeting decorum rules and good manners prohibit raucous behavior" and that he could have been expelled from the meeting "if he had discussed the assault." Doc. 119 at ¶ 46.

[12]Danielson's TMJ condition predates his encounter with Huether. Doc. 118 at ¶ 8; Doc. 93-2 at 19.

ibuprofen to treat his pain and the swelling in his jaw. Doc. 93-2 at 18–19; Doc. 118 at ¶¶ 14–15. Danielson later referred to the broken tooth as his "gold tooth award." Doc. 91 at ¶ 48; Doc. 119 at ¶ 48; Doc. 93-4 at 10. When asked at his deposition whether he suffered any emotional distress related to the April 14, 2015 assault, Danielson said no. Doc. 91 at ¶ 50; Doc. 119 at ¶ 50.

Danielson testified that he spoke with Ehrisman, Elofson, Thresa Stehly, and City Council members Greg Jamison and Kenny Anderson Jr. at various times after the assault occurred. Doc. 91 at ¶ 70; Doc. 119 at ¶ 70; Doc. 93-2 at 15–17. Danielson called Jamison on April 15, 2015, said that Huether assaulted him when leaving the informational meeting the day before, and asked Jamison to "have all the videos saved." Doc. 72-1 at 15; Doc. 93-5 at 13. Danielson testified that he spoke to Anderson about the assault and asked him to save any video from the Carnegie Town Hall Council Chamber for April 14, 2015. Doc. 91 at ¶ 71; Doc. 119 at ¶ 71. Anderson averred that he had no recollection of Danielson speaking with him about video or security footage from the meeting.[13] Doc. 96 at ¶ 4; Doc. 91 at ¶ 73; Doc. 119 at ¶ 73.

On April 20, 2015, Danielson sent an email to the City Council members thanking them for the opportunity to participate in the Election Review Committee and arguing that holding the upcoming City Council meeting would violate the City's Charter. Doc. 119-1 at 102. He included a paragraph near the end of the email explaining that a "city administration audience member rudely and childishly banged the back of my head" as that individual left the April 14, 2015 meeting. Doc. 119-1 at 103. Danielson wrote that after the meeting, another audience member informed him that this "same individual had kicked their chair." Doc. 119-1 at 103.

---

[13]Danielson alleged in his complaint that Huether struck Anderson in the back of the head during a different City meeting. Doc. 1 at ¶ 76. Anderson averred that Huether did not strike him during that meeting and has never assaulted or attempted to assault him. Doc. 96 at ¶ 6.

On or about April 22, 2015, Danielson called the Minnehaha County State's Attorney to report that Huether had assaulted him at the meeting.  Doc. 119 at ¶ 78; Doc. 66-1 at 9; Doc. 119-1 at 113–14.  Danielson believed that the Sioux Falls Police Department would have a conflict of interest, so the State's Attorney referred him to the DCI.  Doc. 119 at ¶ 78; Doc. 66-1 at 9.  DCI Agent Jim Severson was assigned to the case.  Doc. 91 at ¶ 79; Doc. 119 at ¶ 79.  He interviewed Huether, Danielson, Hogstad, Klemme, Brett Mathison, Quanbeck Etten, and Schaeffer, but did not interview Ehrisman or Elofson.  Doc. 91 at ¶ 80; Doc. 119 at ¶ 80; Doc. 66-1; Doc. 119-1 at 116, 118.  Agent Severson closed the investigation after concluding that it was "apparent there is no evidence that a crime was committed."[14]  Doc. 66-1 at 1; Doc. 91 at ¶ 80; Doc. 119 at ¶ 80.  Danielson did not seek a civil protective order against Huether.  Doc. 91 at ¶ 81; Doc. 119 at ¶ 80; Doc. 93-2 at 26.  During the public-input portion of the City Council meetings, Danielson mentioned the alleged assault at least four times but did not specifically name Huether as the person who assaulted him.[15]  Doc. 91 at ¶¶ 81–82; Doc 119 at ¶¶ 81–82.  Danielson did not file an ethics complaint against Huether for the alleged assault, testifying that he considered the assault "beyond an ethics issue."  Doc. 91 at ¶ 83; Doc. 119 at ¶ 83.  In his response to Huether's Statement of Undisputed Material Facts, Danielson argues that the Ethics Board was not an appropriate body to consider the assault.  Doc. 119 at ¶ 83.

## C.  Encounters after City Council meetings

---

[14]Danielson contends that jurors could consider Severson's statement "to be a victory lap celebrating compliance with his bosses [sic] instructions to ensure that all the videos were spoliated and that any evidence which had existed no longer existed."  Doc. 119 at ¶ 80.  Danielson has not produced any evidence that Severson's "boss" told him to destroy evidence or allow evidence to be destroyed.

[15]Danielson claims that he mentioned the assault by Huether five times but does not cite anything that supports this claim.  Doc. 119 at ¶¶ 81–82.  He also asserts that he did not mention Huether specifically because "the rules of the City Council . . . did not allow direct accusations to be made during public inputs."  Doc. 119 at ¶ 81.

Danielson alleges that Huether attempted to intimidate and provoke him outside Carnegie Town Hall after City Council meetings occurring on November 10, 2015, January 19, 2016, July 19, 2016, and December 5, 2017. Doc. 1 at ¶¶ 80–84. Danielson attended the November 10, 2015 City Council meeting with either his disabled sister or Kermit Staggers. Doc. 91 at ¶ 92; 119 at ¶ 92. He parked his car "[r]ight at the corner" on the south side of Tenth Street in front of Carnegie Town Hall. Doc. 91 at ¶ 91; Doc. 119 at ¶ 91; Doc. 93-2 at 21. Danielson submitted an exhibit showing that the Carnegie Town Hall's main door faces north towards Tenth Street, that Danielson's parking spot was on the corner to the west of the main door, and that there is a City parking lot to the east of the main door. Doc. 120-1 at 1. During the public input portion of the meeting, Danielson spoke about problems with SIRE/City Link (City broadcasting equipment), the possibility of placing videos of City Council Meetings on his YouTube channel, missing corrected North Phillips Land Sale documents, and a missing statue base and statue. Doc. 91 at ¶ 86; Doc. 119 at ¶ 86. Huether thanked Danielson for his comments. Doc. 91 at ¶ 86; Doc. 119 at ¶ 86.

Danielson testified that when he left the meeting, Huether was standing on the sidewalk near the "rear driver's side corner of my vehicle, the way I would have gone around the vehicle with the disabled person to get them into the vehicle." Doc. 91 at ¶ 93; Doc. 119 at ¶ 93. Danielson walked around the front of his car, helped his passenger get in, and left. Doc. 91 at ¶ 94; Doc. 119 at ¶ 94. Neither Huether nor Danielson said anything to one another and there was no physical contact between the two. Doc. 91 at ¶¶ 95–96; Doc. 119 at ¶¶ 95–96. Danielson testified that he thought Huether was upset based on his body language, although he could not describe it, saying, "Having watched him, I know it when I see it." Doc. 91 at ¶ 96; Doc. 119 at ¶ 96. Huether did not make any gestures or faces at Danielson but was "just looking" at him. Doc. 91 at ¶ 97; Doc.

119 at ¶ 97.  Danielson admitted that there were other people leaving the meeting at the same time, although he did not say how many people there were or that they were near his vehicle.  Doc. 91 at ¶ 98; Doc. 119 at ¶ 98.  He testified that as he drove away, he saw Huether walking east toward the City parking lot where Huether usually parked.  Doc. 93-2 at 22; Doc. 120-1 at 13.  Danielson believes that Huether was trying to provoke him into doing something that would justify a criminal prosecution or law enforcement officers in shooting him;  he believes that law enforcement officers in Sioux Falls are able to "kill or assault anyone at the slightest provocation with no effective consequences."  Doc. 91 at ¶ 99; Doc. 119 at ¶ 99.  He was concerned on November 10, 2015, that law enforcement could be waiting in the dark for provocation that would allow them to use deadly force against him.  Doc. 91 at ¶ 99; Doc. 119 at ¶ 99.  However, Danielson did not see any law enforcement officers waiting for him on any of the occasions he claims Huether was standing by his car.  Doc. 91 at ¶ 99; Doc. 119 at ¶ 99.

The encounters on January 19 and July 19 were similar.  Doc. 91 at ¶ 100; Doc. 119 at ¶ 100; Doc. 93-2 at 23–24.  Danielson attended the January 19, 2016 meeting with Kermit Staggers.  Doc. 91 at ¶ 101; Doc. 119 at ¶ 101.  He parked his car on South Dakota Avenue, facing north, near the corner of South Dakota Avenue and Tenth Street.  Doc. 91 at ¶ 101; Doc. 119 at ¶ 101; Doc. 120-1 at 11–13.  During the public-input portion of the meeting, Danielson spoke about American government and democracy, the customer-use charge for car rentals, and a perceived executive-session infraction.  Doc. 91 at ¶ 87; Doc. 119 at ¶ 87; Doc. 120-1 at 12.  When Danielson left the meeting, Huether was standing on the sidewalk near the rear of Danielson's car on the passenger side.  Doc. 91 at ¶ 101; Doc. 119 at ¶ 101.  Danielson thought Huether seemed agitated.  Doc. 91 at ¶ 101; Doc. 119 at ¶ 101.  No one said or did anything, and there was no physical contact.  Doc. 91 at ¶ 101; Doc. 119 at ¶ 101.  Danielson testified that the same thing happened

23

after the July 19, 2016 meeting. Doc. 91 at ¶ 102; Doc. 119 at ¶ 102; Doc. 93-2 at 24. At that meeting, Danielson spoke about code enforcement, citizen interest in city government, a newspaper story about the South Dakota Public Assurance Alliance, how Rapid City was opening its records to the public, the proposed City Administration Building, and how a member of the administration had assaulted him on April 14, 2015. Doc. 91 at ¶ 88; Doc. 119 at ¶ 88; Doc. 120-1 at 37. Danielson testified that Huether was standing by his car when he left the meeting but that Huether did not do or say anything. Doc. 91 at ¶ 102; Doc. 119 at ¶ 102; Doc. 93-2 at 24.

For the December 5, 2017 City Council meeting, Danielson parked his car on South Dakota Avenue near the crosswalk parallel to Tenth Street. Doc. 120-1 at 48–49. At the meeting, Danielson spoke about being "shouted down" by the City Council and members ignoring speakers during the public input portion of the meetings. Doc. 91 at ¶ 89; Doc. 119 at ¶ 89; Doc. 120-1 at 49. He also spoke in opposition to an ordinance authorizing a parking ramp and hotel in downtown Sioux Falls while holding a clipboard that said, "Why we Lie." Doc. 120-1 at ¶ 13; Doc. 93 at ¶ 4. Danielson testified that he saw Huether standing by his car as he was leaving the building, so he asked one of the City's security officers to accompany him to his car. Doc. 91 at ¶ 103; Doc. 119 at ¶ 103. As Danielson and the security guard walked outside, Huether left and walked into the south parking lot. Doc. 91 at ¶ 104; Doc. 119 at ¶ 104. Huether denies that he ever waited by Danielson's car on the street after a public meeting. Doc. 91 at ¶ 105; Doc. 119 at ¶ 105.

## III.  Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56(a) places the burden initially on the moving party to establish the absence of a genuine issue of material fact and entitlement to

judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). Once the moving party has met that burden, the nonmoving party must establish that a material fact is genuinely disputed either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A), (B); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145–46 (8th Cir. 2012); see also Mosley v. City of Northwoods, 415 F.3d 908, 910 (8th Cir. 2005) (stating that a nonmovant may not merely rely on allegations or denials). A party opposing a properly supported motion for summary judgment "may not merely point to unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor, without resort to speculation, conjecture, or fantasy." Reed v. City of St. Charles, 561 F.3d 788, 790–91 (8th Cir. 2009) (cleaned up and citations omitted). In ruling on a motion for summary judgment, the facts and inferences fairly drawn from those facts are "viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)).

## IV.    Analysis

### A.  First Amendment retaliation

The First Amendment generally bars government officials from retaliating against an individual for exercising his right to free speech. Hartman v. Moore, 547 U.S. 250, 256 (2006). To state a First Amendment retaliation claim, Danielson must show: (1) that he engaged in activity protected by the First Amendment; (2) that Huether took adverse action against him that would chill a person of ordinary firmness from continuing the activity; and (3) that the adverse action was motivated at least in part by Danielson's protected activity. Bennie v. Munn, 822 F.3d 392,

25

397 (8th Cir. 2016); Greenman v. Jessen, 787 F.3d 882, 891 (8th Cir. 2015); see Mt. Healthy City

Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

### i.    April 14, 2015 incident

Huether argues that no reasonable jury could find that he assaulted Danielson and that there

is no evidence to connect the alleged assault to Danielson's protected activity. This first argument

deserves discussion while the second argument merits summary judgment.

### a.    There is little evidence that Huether assaulted Danielson.

The evidence and arguments Huether offered in support of his motion for summary

judgment show that Danielson would have a very difficult time proving his case to a jury. First,

the affidavits Huether offered from people at the April 14, 2015 meeting indicate that no assault

occurred. Hitterdal, whom Danielson testified was immediately behind Huether when the assault

happened, averred that she does not recall seeing Huether strike Danielson or kick Ehrisman's

chair and that she would have remembered either of these incidents if they had occurred. Doc.

102 at ¶ 6. Karsky, the City Council Chair at the April 14, 2015 meeting, averred that he watched

Huether and the other department heads exit the room, that he does not recall seeing Huether hit

or strike Danielson, and that it would have been "obvious" from his perspective in the room if an

assault had occurred. Doc. 98 at ¶ 5. In fact, Karsky remembered Danielson smiling at Huether

as he exited, which he thought was odd "because Danielson was usually very confrontational and

angry about most proposals by the City." Doc. 98 at ¶ 4. Quanbeck Etten averred that she exited

the meeting by walking behind the audience, that she did not recall seeing Huether strike Danielson

or kick Ehrisman's chair, and that she "would have seen it" if something had happened.[16] Doc.

---

[16]Although Turbak, Hogstad, and Anderson also averred that they did not recall seeing Huether
strike Danielson, Doc. 97 at ¶ 7, Doc. 99 at ¶ 4, Doc. 96 at ¶ 4, their affidavits are unclear on

100 at ¶ 6. Second, the handwritten records from Danielson's dentist, while somewhat difficult to read, suggest that the crown Danielson claims he needed because of the assault had been recommended several years earlier to fix a crack that existed then. Doc. 91 at ¶¶ 61–65; Doc. 93-3 at 5–7. Third, Danielson has not produced testimony from anyone who actually saw Huether assault him. And fourth, Danielson did not mention the assault when he subsequently spoke during the April 14, 2015 meeting.

At the same time, Danielson has produced some evidence that Huether assaulted him. Again, Danielson testified that as Huether was walking behind him to leave the meeting room, he struck him in the back of the head with his elbow and then kicked the chair Ehrisman was sitting in. Doc. 91 at ¶ 43; Doc. 119 at ¶ 43. Danielson did not see Huether strike him, but when he turned to the left, he saw "Huether pulling his elbow back into his side." Doc. 91 at ¶ 44; Doc. 119 at ¶ 44. Ehrisman's testimony corroborates part of Danielson's testimony. Ehrisman believed that Huether kicked his chair as Huether exited the meeting behind him. Doc. 93-4 at 5–6. Ehrisman did not see Huether kick his chair, but testified that he turned to his left after his chair moved and saw Huether walking by. Doc. 93-4 at 5–7. Ehrisman also testified that although he did not see Huether strike Danielson because he was facing forward, Danielson acted "strange" and seemed "a little disoriented" after Huether walked by.[17] Doc. 93-4 at 6.

Whether Danielson has presented enough evidence to support a jury finding in his favor is a close question. It is true, of course, that courts ruling on a summary judgment motion must

---

whether they were watching Huether exit the room or would have been in a position to see the alleged assault.

[17]Ehrisman's testimony on how Danielson looked after Huether walked by is sort of a mixed bag. He testified that he "didn't think nothing of" Danielson seeming disoriented because he thought Danielson "was thinking about something" but then went on to say that this seemed weird and that Danielson was acting strange. Doc. 93-4 at 6.

view the evidence in the nonmoving party's favor and may not weigh the evidence or make credibility determinations. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Leonetti's Frozen Foods, Inc. v. Rew Mktg., Inc., 887 F.3d 438, 442 (8th Cir. 2018). In rare circumstances, however, a plaintiff's sworn testimony will not suffice to create a genuine dispute of material fact. In Reed, for instance, the Eighth Circuit affirmed a grant of summary judgment where the plaintiff's "contradictory testimony" was the only evidence supporting his claim of excessive force and the defendants provided "overwhelming evidence" refuting this testimony. 561 F.3d at 791–92 (citation omitted). The Second Circuit reached a similar decision in Jeffreys v. City of New York, 426 F.3d 549 (2d Cir. 2005), concluding that the district court could disregard the plaintiff's testimony claiming excessive force because it was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit" it. Id. at 555 (cleaned up and citation omitted).

Huether contends that this is one of the rare cases where the plaintiff's testimony can be disregarded. Danielson's case bears similarity to Reed and Jeffreys in that his claim rests largely on his own testimony and most of the evidence in the record suggests that this testimony is not credible. Unlike the plaintiffs in Reed and Jeffreys, however, Danielson's testimony does not contradict anything he said previously. Indeed, Danielson's testimony about the alleged assault is consistent with what he told the DCI agent back in April 2015 and with what he has maintained throughout the pendency of this case.[18] Doc. 66-1 at 11. If there ever was any contact between

---

[18]Danielson has been inconsistent about how he learned of Huether allegedly kicking Ehrisman's chair, however. In his April 20, 2015 email to the City Council, Danielson wrote that an "audience member" told him that the "same individual" who "banged" the back of Danielson's head had kicked this individual's chair. Doc. 119-1 at 103. And according to the DCI report, Danielson said that Ehrisman had told him about Huether kicking his chair after the meeting. Doc. 66-1 at 11. During his deposition, however, Danielson testified that he actually saw Huether kick Ehrisman's chair. Doc. 93-2 at 12–13.

Huether and Danielson's head, it clearly was not of the severity Danielson claims given how, for instance, Danielson's dental records belie his claim that Huether caused him to need a dental crown. Nevertheless, and ultimately, this Court need not decide whether a reasonable juror could believe Danielson's testimony because even if some physical contact occurred, Danielson has failed to show a material question of fact on the last element of the First Amendment retaliation test.

### b. No reasonable jury could find a causal connection between the assault and Danielson's protected activity.

This last element requires Danielson to show that the assault was motivated at least in part by his protected activity. Whether a causal connection exists is "generally a jury question, but it can provide a basis from summary judgment when the question is so free from doubt as to justify taking it from the jury." Revels v. Vincenz, 382 F.3d 870, 876 (8th Cir. 2004) (cleaned up and citation omitted). A plaintiff may demonstrate a causal connection through circumstantial evidence, such as unusually suggestive timing for the adverse action. Tyler v. Univ. of Ark. Bd. of Trs., 628 F.3d 980, 986 (8th Cir. 2011).

As this Court explained when ruling on Huether's motion to dismiss, Danielson's complaint did not specify what constitutional activity motivated Huether to assault him. Danielson v. Huether, 355 F. Supp. 3d 849, 861 (D.S.D. 2018). However, Danielson did allege that he filed an ethics complaint against Huether in March 2014 and that this made Huether angry. Id. He also alleged, albeit without providing specific dates, that he worked during Huether's tenure as mayor to "publicize" the benefits Huether's family was receiving from Huether's official actions. Id. This Court relied on these allegations to hold that Danielson's complaint raised a plausible inference that Huether assaulted him in retaliation for Danielson filing the ethics complaint and otherwise criticizing him.

But these allegations are not enough now that Huether has moved for summary judgment.

Reed, 561 F.3d at 790–91. Huether argued that there was no evidence of a causal connection

between any particular protected activity by Danielson and the alleged assault. Doc. 92 at 17–21.

He offered evidence establishing that Danielson did not speak at the public-input portion of the

City Council meetings in January, February, or March of 2015, or during the public-input portion

of the April 7 and April 14, 2015 meetings. Doc. 91 at ¶ 13; Doc. 119 at ¶ 13.[19] Huether also cited

to Danielson's testimony during his deposition that he did not do anything during the April 14,

2015 meeting that would have given Huether cause to be upset with him.[20] Doc. 91 at ¶ 47; Doc.

119 at ¶ 47. Once Huether moved for summary judgment, it became Danielson's burden to show

that he could prove causation at trial. See Celotex, 477 U.S. at 323 ("The moving party is 'entitled

to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient

showing on an essential element of her case with respect to which she has the burden of proof.");

Garden v. Cent. Neb. Hous. Corp, 719 F.3d 899, 906 (8th Cir. 2013) (granting summary judgment

against nonmoving party where nonmoving party failed to offer any evidence on issues it would

be required to prove at trial).

Danielson has not met this burden. Danielson's brief opposing summary judgment did not

specify what protected activity allegedly motivated Huether to assault him, thus leaving this Court

---

[19]Danielson disputes this fact but does not cite to anything in the record to show that he spoke during the public input portion of these meetings. Doc. 119 at ¶ 13. He also claims that he spoke at "multiple" other meetings but does not cite any evidence in support. Doc. 119 at ¶ 13.

[20]Danielson disputes this "fact," but that is how he testified. Doc. 119 at ¶ 47. He also claims that he had "other interactions" with Huether shortly before the April 14, 2015 meeting but does not cite to the record to support this claim. Doc. 119 at ¶ 47. As explained above, this Court's local rules require a party opposing a statement of material fact to make "appropriate" citations to the record. Moreover, a district court ruling on a summary judgment motion "is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 260 (8th Cir. 1996) (citation omitted).

to guess what that activity might be. Doc. 118.[21] Danielson did file three ethics complaints against Huether in March 2014, but this was over a year before Huether allegedly assaulted him. This gap between protected activity and the adverse action is too long for Danielson to rely on temporal proximity to show a causal connection. Tyler, 628 F.3d at 986 (explaining that the inference of retaliation "vanishes altogether when the time gap between the protected activity" and adverse action is measured in months); Kilpatrick v. King, 499 F.3d 759, 768 (8th Cir. 2007) (finding that timing "weighs against an inference of retaliatory intent" where adverse action occurred nine months after protected activity). Nor can Danielson use the videos he allegedly posted to show causation. Danielson asserts in paragraphs 1–6 of his Partial Statement of Undisputed Material Facts that he posted videos criticizing Huether's decisions as mayor to his YouTube channel or website in the six months preceding the alleged assault. Doc. 118 at ¶¶ 1–6. However, these videos cannot serve as a basis for inferring retaliatory motive because Danielson has not cited any evidence that Huether saw or even knew of the videos. Wilson v. Northcutt, 441 F.3d 586, 592–93 (8th Cir. 2006) (holding that the plaintiff's lawsuit could not support an inference of retaliatory intent because the plaintiff had not offered any evidence that the defendant knew of the lawsuit).

Danielson argues that a jury could infer that Huether had a retaliatory motive because Huether offered no explanation for why he assaulted Danielson, whom Huether knew only as a citizen of Sioux Falls. Doc. 118 at ¶¶ 32–34. This argument does not make up for the lengthy gap between the ethics complaints and the alleged assault and the lack of any evidence connecting the two. Put simply, no reasonable jury could find that Danielson's ethics complaints (promptly

---

[21]Danielson's brief opposing summary judgment failed to respond at all to Huether's argument that there was no evidence of causation. Doc. 118 at 1–6. However, he attached a "Partial Statement of Undisputed Material Facts" to his brief and makes some arguments about causation in that document. Doc. 118 at ¶¶ 32–35.

dismissed as frivolous) were the reason Huether decided to assault Danielson during a public meeting more than a year later. Indeed, it beggars belief that Huether would lie in wait for over a year and then choose to exact his revenge by assaulting Danielson in the midst of a public meeting. Danielson's speculation that Huether assaulted him because of the ethics complaint is not enough for his claim to survive summary judgment. Wilson, 441 F.3d at 592–93 (holding that plaintiff's mere belief that the defendant acted from a retaliatory motive was insufficient to survive summary judgment). Huether is entitled to summary judgment on the claim that he assaulted Danielson during the April 14, 2015 meeting in retaliation for Danielson exercising his First Amendment rights.

> ii.    **The encounters after the City Council Meetings would not chill a person of ordinary firmness and do not amount to deprivation of a clearly established right.**

Huether argues that the claims based on his allegedly standing by Danielson's car fail the second element of the retaliation test because this conduct would not deter a person of ordinary firmness from speaking. He also argues that qualified immunity applies because Danielson cannot show that he was deprived of a clearly established right. This Court agrees with both arguments.

The second element of the retaliation test is objective, asking how a person of ordinary firmness would have responded to the adverse action. Garcia v. City of Trenton, 348 F.3d 726, 729 (8th Cir. 2003). This element "is designed to weed out trivial matters from substantial violations of the First Amendment." Gonzalez v. Bendt, 971 F.3d 742, 745 (8th Cir. 2020). Summary judgment is appropriate when the alleged retaliatory harassment is so minor that allowing the claim to proceed would "trivialize the First Amendment." Naucke v. City of Park Hills, 284 F.3d 923, 928 (8th Cir. 2002) (citation omitted).

In Carroll v. Pfeffer, 262 F.3d 847 (8th Cir. 2001), for instance, the Eighth Circuit held that a police officer's "unprofessional and inappropriate" conduct would not chill a person of ordinary firmness when, over a course of three years, the officer attempted to open the plaintiff's car door while she was stopped at an intersection, bumped into her in a store, shouted and shook his fist at her while she passed out petitions, and drove by her twice while she was in a phonebooth to glare at and taunt her. Id. at 849, 850. Similarly, the Eighth Circuit in Naucke held that the embarrassment, humiliation, and emotional distress the plaintiff suffered from being harassed by city officials would not deter a person of ordinary firmness. 284 F.3d at 928. The Eighth Circuit in Naucke upheld summary judgment for the city officials even though they had retaliated against the plaintiff by conducting a public audit of the fire department ladies' auxiliary while she was president, publicly scolded her during city council meetings, engaged in public name calling, posted a picture of her home with a disparaging comment, and circulated a letter suggesting that a city administrator had fathered one of her children. Id. at 927–28.

Huether's conduct is not severe enough to deter a person of ordinary firmness and indeed is less severe than the conduct of the defendants in Carroll and Naucke. Huether simply stood by Danielson's car on a public sidewalk after four City Council meetings. He did not speak to Danielson, make any gesture towards him, or touch him. These encounters were brief, lasting only as long as it took Danielson and his passenger to enter the car and drive away. They were also infrequent, occurring over a period of more than two years. Moreover, Danielson continued to speak at City Council meetings after the encounters, Doc. 91 at ¶ 12; Doc. 119 at ¶ 12, which suggests that Huether's conduct would not have deterred a person of ordinary firmness, see Gonzalez, 971 F.3d at 745 (considering the plaintiff's actions in response to the alleged retaliation

"as evidence of what a person of ordinary firmness would have done"); Naucke, 284 F.3d at 928 (considering that the plaintiff "continued to speak out" after the adverse action).

Danielson argues that Huether's conduct satisfies the ordinary firmness test because he had a "reasonable concern" that Huether had arranged for law enforcement to wait outside Carnegie Town Hall and either arrest Danielson on false charges or fatally injure him. Doc. 118 at 5. However, Danielson did not produce any evidence that this "concern" was anything other than contrived.

A better argument would be that the encounters after the City Council meetings were intimidating because Huether allegedly had already assaulted Danielson back in April 2015. But Danielson did not make this argument, and it would not be successful even if he had. After all, the alleged assault occurred over six months before Huether began standing by Danielson's car and is simply not enough to transform Huether's otherwise benign conduct into something that would deter a person of ordinary firmness.

Moreover, Huether is entitled to qualified immunity because even if he did violate Danielson's rights, this right was not clearly established. Reichle v. Howards, 566 U.S. 658, 664 (2012). A right is "clearly established" if the law was sufficiently clear that every reasonable city official would understand that his conduct violated that right. District of Columbia v. Wesby, 138 S. Ct. 577, 589–90 (2018). Although a plaintiff need not cite a "case directly on point" to show that a right is clearly established, "controlling authority" or "a robust consensus of cases of persuasive authority" must put the "constitutional question beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741–42 (2011) (citation and internal marks omitted). Courts deciding whether a constitutional right is clearly established must avoid defining the right at "a high level of generality." Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018) (per curiam) (citation and internal

marks omitted). Instead, the "dispositive question is whether the violative nature of *particular* conduct is clearly established." <u>Mullenix v. Luna</u>, 136 S. Ct. 305, 308 (2015) (per curiam) (citation and internal marks omitted). Danielson has not cited, and this Court has not found, any case making it clear that a city official who stands near a citizen's car in a public place without saying or doing anything violates the First Amendment, even if that official assaulted the citizen six months previously. And cases like <u>Carroll</u> and <u>Naucke</u> suggest that any such right is not clearly established. The retaliatory conduct in those cases—which did not inflict a constitutional injury— was more severe than Huether standing by Danielson's car. Although the alleged assault adds a wrinkle that wasn't present in <u>Carroll</u> or <u>Naucke</u>, these cases still undercut any claim that Huether violated a clearly established right.

## B. Danielson's state-law claims fail.[22]

Danielson alleged state-law claims against Huether for assault, stalking, intentional infliction of emotional distress, and invasion of privacy. Doc. 1 at ¶¶ 33–34, 85–86. Huether moved for summary judgment on all these claims, and Danielson did not make any arguments in response. Nevertheless, this Court briefly explains why Huether is entitled to summary judgment on Danielson's state-law claims.

---

[22]The termination of Danielson's federal claims would normally mean that this Court should decline to exercise supplemental jurisdiction over his state-law claims. <u>See Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."). However, this case has already progressed so far that retaining supplemental jurisdiction over Danielson's state-law claims will serve the interests of judicial economy, convenience, fairness, and comity. <u>See Thomas v. United Steel Workers Local United 1938</u>, 743 F.3d 1134, 1141 (8th Cir. 2014) (upholding a district court's decision to continue to exercise supplemental jurisdiction "[g]iven the substantial amount of time and judicial resources expended in the case"). This Court therefore retains jurisdiction over Danielson's state-law claims.

### i.     The assault claim is untimely.

South Dakota law required Danielson to bring his assault claim "within two years" after it "accrued."  SDCL § 15-2-15(1).  The statute of limitations bars Danielson's assault claim because while Huether allegedly assaulted Danielson on April 14, 2015, Danielson waited until nearly three years later (April 13, 2018) to file this suit.  Doc. 1.

### ii.     No reasonable jury could find in Danielson's favor on the stalking claim.

Danielson alleges a claim for stalking under SDCL § 22-19A-1, which is a criminal statute. Huether argues that Danielson does not have a private right of action under this statute, but there is caselaw that at least suggests otherwise.  See Stanley v. Hall, No. CIV 05-5104-KES, 2006 WL 3138824, at *16–17 (D.S.D. Oct. 31, 2006) (denying summary judgment on stalking claim under SDCL § 22-19A-1 without addressing whether the statute provides a private right of action). Regardless, Danielson does not explain how Huether's conduct meets the elements of § 22-19A-1, and no reasonable jury could find that Huether standing on a public sidewalk by Danielson's car a few times constitutes stalking.  See SDCL § 22-19A-1.

### iii.     Danielson cannot meet the elements of the test for intentional infliction of emotional distress.

Plaintiffs alleging intentional infliction of emotional distress in South Dakota must show four elements:

> 1. An act by defendant amounting to extreme and outrageous conduct;
> 2. Intent (or recklessness) on the part of the defendant to cause plaintiff severe emotional distress;
> 3. The defendant's conduct was the cause-in-fact of plaintiff's distress; and
> 4. The plaintiff suffered an extreme disabling emotional response to defendant's conduct.

Reeves v. Reiman, 523 N.W.2d 78, 83 (S.D. 1994) (citation omitted). South Dakota law sets a high bar for showing extreme and outrageous conduct. Harris v. Jefferson Partners, L.P., 653 N.W.2d 496, 500 (S.D. 2002) ("Proof under this tort must exceed a rigorous benchmark."); Richardson v. Richardson, 906 N.W.2d 369, 377 (S.D. 2017) (explaining that the "high threshold" for intentional infliction of emotional distress "prunes out nonmeritorious suits"). To be actionable, the defendant's conduct "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community." Fix v. First State Bank of Roscoe, 807 N.W.2d 612, 618 (S.D. 2011) (citation omitted). Whether a defendant's conduct is extreme and outrageous enough to permit recovery is initially a question for the trial court. Id.; Richardson v. East River Elec. Power Coop., Inc., 531 N.W.2d 23, 27 (S.D. 1995). Only "[w]here reasonable men may differ, [is it] for the jury . . . to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." Richardson, 531 N.W.2d at 27 (citation omitted).

Danielson bases his claim for intentional infliction of emotional distress on the four alleged encounters he had with Huether after the City Council meetings. Doc. 1 at ¶¶ 80–84, 86. Huether standing by Danielson's car on a public sidewalk, without saying or doing anything, was not "so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community." Fix, 807 N.W.2d at 618. Moreover, Danielson has not offered any evidence that Huether's conduct caused him an extreme disabling emotional response. Huether is entitled to summary judgment on Danielson's claim for intentional infliction of emotional distress.[23]

_____

[23] A claim for intentional infliction of emotional distress based on the April 14, 2015 assault would also fail. Danielson testified during his deposition that he did not suffer any emotional distress related to the alleged assault. Doc. 91 at ¶ 50; Doc. 119 at ¶ 50.

### iv.    Huether did not invade Danielson's privacy.

Danielson claims that Huether's standing by his car on a public sidewalk after the four City Council meetings constitutes an invasion of privacy. Doc. 1 at ¶¶ 80–84, 86. Although he did not brief this claim, he appears to be proceeding under the intrusion-upon-seclusion theory of invasion of privacy. See Gates v. Black Hills Health Care Sys., 997 F. Supp. 2d 1024, 1031–32 (D.S.D. 2014) (explaining that South Dakota appears to recognize several different theories or forms of the tort of invasion of privacy). To succeed on this claim, Danielson must show that he had an objectively reasonable expectation of seclusion or privacy in the matter intruded upon. Id. at 1033. Danielson has not shown that he had an objectively reasonable expectation of privacy when leaving a City Council meeting and walking to his car parked on a public street. Summary judgment is appropriate on Danielson's claim for invasion of privacy.

### V.    Conclusion

For the reasons stated above, it is hereby

ORDERED that Danielson's Motions to Strike, Docs. 107–116, are denied. It is further

ORDERED that Huether's Motion for Summary Judgment, Doc. 90, is granted.

DATED this  21st  day of January, 2021.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE

38